Cynthia **WESTON**, Plaintiff-Respondent,

v.

**GREAT CENTRAL INSURANCE COMPA-
NY, Defendant-Appellant,**

and

Government Employees Insurance Company
and State Farm Mutual Automobile Insur-
ance Company et al., Defendants-Respond-
ents.

No. 9484.

Missouri Court of Appeals,
Springfield District.

Sept. 6, 1974.

E. L. Monroe, Monett, for plaintiff-respondent.

B. H. Clampett, Daniel, Clampett, Ellis, Rittershouse, & Dalton, Springfield, for defendant-appellant.

Kenneth W. Haile, Johnson & Rice, Neosho, for defendant-respondent Government Employees Ins. Co.

Karl W. Blanchard, Blanchard, Van Fleet, Robertson & Dermott, Joplin, for defendant-respondent State Farm Mut. Auto. Ins. Co.

BILLINGS, Judge.

In this suit for a declaratory judgment the Circuit Court of Barry County entered judgment that Great Central Insurance Company [herein Great Central] afforded liability coverage to plaintiff Cynthia Weston, as to claims of third parties and that policies of Government Employees Insurance Company [herein GEICO] and State Farm Mutual Automobile Insurance Company [herein State Farm] did not provide coverage. Great Central appeals, contend-

ing its policy does not afford coverage and suggesting that the policies of GEICO and State Farm are applicable. We affirm.

On June 12, 1969, plaintiff Cynthia Weston was driving a Cadillac automobile which was owned by her son-in-law, Captain Legg, when it was involved in a collision with a motor vehicle operated by a Mrs. Wood. As a result of the collision Mrs. Wood and her husband brought suit against plaintiff for damages.

The Cadillac had just been repaired and serviced at "Weston's Standard Service," a service station at Monett, Missouri, operated by plaintiff's husband [William Weston] and son, and plaintiff was delivering the automobile to either the Weston home or the Legg residence at the time of the collision. The Cadillac was covered by a liability policy issued by GEICO. Great Central had a liability policy affording "Garage Insurance Coverage" to the service station. State Farm's liability policy covered the Weston's personal automobile.

A few days before the collision Captain Legg, his wife and children, came to Missouri from Florida for the purpose of locating a residence near the Weston home. The captain had received overseas orders and wanted his family located near his wife's parents. The Weston home was some 18 miles from the service station and the Leggs found a suitable residence about three miles away from the Weston dwelling. Captain and Mrs. Legg were to return to Florida June 12th, by commercial flight from Springfield, to complete some unfinished business and their children were to remain with the maternal grandparents. It was tentatively planned for Mrs. Weston to drive her daughter and son-in-law to the airport in the latter's Cadillac and then leave the automobile at the Legg residence [to give the appearance that the home was inhabited] or at the Weston home.

During the course of the Legg family spending the night of June 11th with Mr. and Mrs. Weston, Captain Legg mentioned to his father-in-law that the Cadillac was

running "rough." Mr. Weston suggested that he take the Cadillac to the service station and check it out and it was agreed that the car would also be serviced [lubrication, change of oil and oil filter] at the same time. It was understood that upon completion of repairs and service to the Cadillac by Mr. Weston that the automobile was to be parked at either the Legg residence or Weston home until the Legg's returned from Florida in a few days. Captain and Mrs. Legg were driven by Mrs. Weston to the airport at Springfield in the Weston family automobile.

William Weston had operated the service station for approximately two years and was assisted in its operation by his son. Mrs. Weston also helped out at the station on occasion, picking up and delivering cars for servicing, cleaning the restrooms, pumping gas and picking up needed automobile parts from suppliers. She was authorized to sign checks on the station account and assisted in the making of bank deposits for the station "sometimes it's daily, usually two to three times a week." Mrs. Weston had invested her own money in the station venture and thought of herself as a partner in its operation, as well as a "flunky."

In addition to selling gas and oil, the station offered "complete car care." Included were oil change, filters, lubrication, wheel alignment, brakes, exhaust systems and "anything but going into major engine repairs." As a part of its service to customers the station offered pick-up and delivery of automobiles. This latter accomodation was one of the six items featured in the station's ad in the telephone book yellow pages. Mrs. Weston often picked up or delivered cars for the station. When asked to deliver customer's cars her husband ordinarily would first have her drive the car between the gas pumps and back the vehicle to get the feel of the automobile.

On the morning of June 12th Mr. Weston drove the Cadillac to the station. He prepared a work order for the automobile and in checking the car discovered one of its wheels was "badly out of balance" and proceeded to repair the same. The automobile was then serviced. The total bill for repairs and service [subsequently paid by Mrs. Legg] amounted to "twenty some odd dollars."

In the meantime Mrs. Weston had driven Captain and Mrs. Legg to the airport in the Weston automobile and en route back to her home stopped at the station. Her husband asked her to drive the Cadillac on home and park it because the Weston car needed servicing. "I will service it and drive it home," Mr. Weston advised his wife. Mrs. Weston agreed to this and, pursuant to her husband's instructions, proceeded to drive the Cadillac between the gas pumps and back the car so that she could get the feel of it. Shortly after Mrs. Weston drove the Cadillac from the station the collision occurred.

In this appeal Great Central argues that Mrs. Weston, while driving the Cadillac, was not engaged in the service station business, and thus no coverage was available to her under its garage liability policy. State Farm contends the lower court's judgment should be affirmed because Mrs. Weston was performing a service incident to the operation of the service station at the time of the accident and therefore, Great Central's policy provided coverage. For the same reason State Farm says its policy did not provide coverage. GEICO avers there was no coverage under its policy because Mrs. Weston, at the time, was engaged in the "automobile business" as excluded in its policy.

Part I of Great Central's "Garage Liability" policy stated: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of Coverage G. bodily injury . . . caused by an occurrence arising out of garage operations, including only the automobile hazard for which insurance is afforded as indicat-

ed in the declarations . . . ." "Automobile Hazard 1" (Part VII) generally includes "The ownership, maintenance or use . . . . of any automobile for the purpose of garage operations . . . ." More specifically, "Automobile Hazard 2" is defined as: "The use in connection with garage operations of any automobile which is neither owned nor hired by the named insured, a partner therein or a member thereof, or a member of the same household as any such person. " '[G]arage' means an automobile sales agency, repair shop, service station, storage garage or public parking place; 'garage operations' means the ownership, maintenance or use of the premises for the purpose of a garage and all operations necessary or incidental thereto.. . . ." Under Part IV of the policy "Persons Insured" include, "with respect to the automobile hazard: (a) any person while using, with permission of the named insured, any automobile to which the insurance applies under the automobile hazard, provided his actual operation or, (if he is not operating) his other actual use thereof is within the scope of such permission . . . ."

State Farm's automobile liability policy, issued to William Weston, provided coverage for the use of non-owned automobiles by the named insured or his spouse (if residents of the same household). "provided such use, operation or occupancy is with the permission of the owner or person in lawful possession of such automobile and is within the scope of such permission." Under "Exclusions—Section I," the policy provided that coverage would not apply to a non-owned car "while maintained or used by any person while such person is employed or otherwise engaged in an automobile business of the insured or of any other person or organization," and under "Definitions—Section I" the policy defined "Automobile Business" as "the business or occupation of selling, leasing, *repairing, servicing,* storing or parking of land motor vehicles or trailers." (our emphasis).

The GEICO policy issued to Captain Legg provided coverage to the insured and "any other person using such automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission" with respect to the owned automobile. Under paragraph "g" of Exclusions, the policy withheld coverage "to an owned automobile while used by any person while such person is employed or *otherwise engaged in the automobile business* . . . ." The policy provided that " 'Automobile Business' means the business or occupation of selling, *repairing, servicing,* storing or parking automobiles . . . ." (our emphasis)

In arriving at its conclusion that Great Central's policy afforded coverage and that the exclusions in the GEICO and State Farm policies were applicable the trial court made extensive findings of fact. Inter alia, the court found: that the station had a pickup and delivery service which was advertised; that plaintiff assisted in the operation of the service station by picking up and delivering cars, by cleaning the wash rooms, pumping gas and making bank deposits; that Mr. Weston said he would take the car [Cadillac] and check it and Captain Legg advised that the car also needed servicing; that Captain Legg instructed Mr. Weston that after the car had been checked and serviced that it be returned to the Weston home or the Legg home; that Mr. Weston took the car to Monett, found one of the wheels out of balance and serviced the car; that when Mrs. Weston arrived at the service station Mr. Weston suggested that she drive the Cadillac home and he would service their family car. The court further found that it was understood and agreed that the Cadillac was to be returned either to the house the Leggs had rented or to the Weston home, and that the car was to be parked until the Leggs returned from Florida; that the relationship between the Leggs

and Westons was, at the time of the collision, a business relationship and that both Captain Legg and Mr. Weston understood that the latter was to be paid for his services in repairing and servicing the Cadillac and was, in fact, paid; that the return of the automobile by plaintiff was a part of one business transaction and thus the accident arose out of and in the course of the operation of the service station business by the Westons. The trial judge specifically found that while plaintiff was operating the Cadillac she was doing so while engaged in the Weston service station business.

Our review, in this court-tried case, is governed by Rule 73.01(d), V.A.M.R., which provides that we are to examine the case upon both the law and the evidence as in suits of an equitable nature and not set aside the judgment entered in the lower court unless clearly erroneous, giving due regard to the opportunity of the trial court to judge of the credibility of the witnesses. And, the Supreme Court has equated "clearly erroneous" with "incorrect". Mission Ins. Co. v. Ward, 487 S.W.2d 449, 452 (Mo.banc 1972). Nonetheless, the judgment of the trial court is presumed to be correct, and the burden on appeal to demonstrate otherwise is on Great Central, the appellant. State ex rel. Mayfield v. City of Joplin, 485 S.W.2d 473 (Mo.App.1972). Since the evidence relating to the issues raised herein arise from either deposition testimony or documents, the deference rule concerning credibility of witnesses is not involved. Miller v. Higgins, 452 S.W.2d 121 (Mo.1970).

The pivotal issue for determination is whether the exclusionary clauses of GEICO and State Farm are applicable and if so, does the garage liability policy of Great Central afford coverage. For the reasons and authorities hereinafter set forth we have concluded that both questions call for an affirmative answer.

Great Central's attack on the lower court's judgment is of many facets and in support thereof advances multiple arguments. However, in commendable candor, Great Central prefaces its challenge to the lower court's findings and conclusions by conceding that if Mrs. Weston's use of the Cadillac was in connection with the service station business she was covered under Great Central's policy. In seeking to avoid such a conclusion Great Central would have us focus our attention on such matters as the family relationship of the Westons and Leggs, the delivery of the Cadillac not being a part of the service station operation and the equation of the coverage as provided for in its policy with the scope and breadth of the exclusions contained in the GEICO and State Farm policies. On the latter proposition we would initially note that Great Central's coverage vel non does not turn on whether the exclusionary clauses in the GEICO and State Farm policies apply.

The primary assault by Great Central is directed to the "automobile business" exclusionary clauses of the GEICO and State Farm policies. Great Central argues that the service to the Cadillac had been completed and that it was by reason of the family relationship and as an accomodation to her son-in-law that she was driving the Cadillac to her home. Thus, Great Central continues, Mrs. Weston was not engaged in the service station business at the time of the collision, and therefore its garage liability policy is inapplicable but coverage was afforded by the policies issued by GEICO and State Farm.

In support of the foregoing we are first cited to Dumas v. Hartford Accident & Indemnity Co., 181 So.2d 841 (La.App.1965). In *Dumas* the court held that an exclusionary clause similar to that of GEICO and State Farm applied only while the insured car was actually being serviced and coverage was afforded the service station operator who was involved in an accident while returning the vehicle to the owner's residence. Great Central, relying on *Dumas,* concludes that "coverage is afforded to Mrs. Weston under the automobile liability

policies, and not under the garage liability policy" because the repair and service to the Cadillac had been completed before the collision.

First of all, as we noted earlier, it does not follow that Great Central's coverage is determinable by the coverage or non-coverage of the GEICO and State Farm policies. Secondly, in DeVille v. United States Fidelity & Guaranty Co., 258 So.2d 694, at p. 697 (La.App.1972), the court said: "The decision in Dumas was based on the court's determination that the work on the insured vehicle had been completed and that therefore the service station attendant who was driving it back to its owner's residence was not 'employed or otherwise engaged in the automobile business.' . . . [W]e opine . . . that the *Dumas* opinion is in error."

In *Deville* an employee of an automobile dealer drove the car's owner to work and while en route to the garage where the vehicle was to be serviced struck another automobile. The owner's policy contained an exclusion similar to those of GEICO and State Farm in this case. In rejecting the garage insurer's contention that the exclusionary clause in the owner's policy did not apply, the court observed that the picking up and delivering of automobiles serviced by the automobile dealer was part and parcel of its "garage operations" and that the driver of the owner's car was engaged in the automobile business as such was defined in the policy, while driving the car to or from the garage.

■ Except for *Dumas* the cases seem to be uniform in holding that an exclusion clause such as contained in the policies of GEICO and State Farm are applicable to accidents occurring in pickup or delivery circumstances and thus are not covered by the owner's liability policy. In Universal Underwriters Ins. Co. v. Pan American Ins. Co., 450 F.2d 1050 (5th Cir. 1971), an employee of a motor company was returning a customer's car after it had been repaired when the vehicle was involved in a collision. The motor company's garage liability carrier argued that primary coverage for a third party's claim was afforded by the automobile owner's liability insurer. The latter policy excluded coverage "to an owned automobile while used by any person while such person is employed or otherwise engaged in the automobile business" and the term "automobile business" was defined as the "business or occupation of selling, repairing, servicing, storing, or parking automobiles." The court agreed that the motor company's driver had the implied permission of the owner to drive the car, and thus was a "person insured" under the policy, but that the automobile business exclusion applied. The court cited Tindall Pontiac, Inc. v. Liberty Mutual Insurance Co., 441 S.W.2d 948 (Tex.Civ. App.1969), which held that under similar facts and a like exclusion an automobile agency and its employee were within the exclusion because the agency was in the "automobile business" and the driver was "directly engaged in performing an act relating to said business." [441 S.W.2d at 949] The *Universal* court rejected the *Dumas* decision and at p. 1053 of 450 F.2d said: "The delivery of an automobile following its repair under warranty is an integral part of the service afforded to customers for the obvious purpose of increasing good will and maintaining friendly customer relations. The application of the business exclusion clause in the [automobile owner's] policy and the finding of primary coverage under [motor company's] garage liability policy . . . is consistent with the rule in most states, and in this circuit, that the responsibility for the operation of a car in the course of its repair, extending to delivery, falls upon the bailee."

In Phoenix Assur. Co. of N. Y. v. Ocean Acc. & G. Corp., Ltd., 145 Colo. 26, 357 P.2d 642 (1960), the owner drove his car to a garage for the purpose of having repairs made on it. A "shag boy" was delegated to drive the owner to his office, which was done. The owner needed transportation during the noon hour and called

the garage and the "shag boy," driving the owner's car, picked the owner up and was taking him to a designated location when the vehicle was involved in a collision. The garage liability carrier contended the automobile liability policy applied. The exclusion clause in the automobile policy excluded from coverage "any person or organization, or . . . any agent or employee thereof, operating an automobile repair shop, public garage, sales agency, service station or public parking place, with respect to any accident arising out of the operation thereof." 357 P.2d at 645. The court held the exclusion applied and that there was ample evidence to support the lower court's finding that the "shag boy" was, at the time of the accident, the agent of the garage, acting within the scope of his employment, and thus covered under the garage liability policy.

In Humble Oil & Refining Company v. Lumbermens Mutual Casualty Company, 490 S.W.2d 640 (Tex.Civ.App.1973), an automobile was picked up for servicing by a service station employee. The car had been serviced and was being delivered when it was involved in a collision. The automobile policy excluded liability coverage to "[a]ny person while employed or otherwise engaged in duties in connection with an automobile business" and the latter term was defined by the policy as "the business or occupation of selling, repairing, servicing, storing or parking automobiles." In rejecting the *Dumas* decision, the court held the exclusion applicable and at p. 642 said: "It has long been the practice of insurance companies issuing standard automobile policies to impose a limitation on the standard omnibus clause contained in the policies so as to not extend coverage to a service station, public garage, sales agency, repair shop, or public parking place, even though such establishment has rightful custody of the vehicle during its operation, maintenance, or use of the vehicle by an employee of such concern. 47 A.L.R.2d 556, Annotation, 'Automobile insurance: omnibus clause exception relating to public garages * * *.' The reason for this

exception is quite obvious since the owner of the vehicle has relinquished his control of the automobile to such garage or repair shop which, in turn, exercising complete control thereof, turns it over to an employee to drive and operate the same in the pursuit of the business of such concern. Thus the risk and hazard to the company issuing the policy is materially enhanced." The court further observed "that the exclusion does not limit itself with the question of 'servicing' of the automobile but specifically applies to the 'business of servicing' automobiles." The court continued (l.c. 643): "We think that the exclusion is clear and unambiguous in saying that while the driver of the service station is either engaged in servicing the automobile or engaged in duties in connection with the business of servicing automobiles that he is not to be considered a named insured under the policy. It cannot be denied that [driver] while returning the . . . automobile to [owner], was certainly performing 'duties in connection with' the service station business . . . This delivery was a part of the business of the service station. It is stipulated that [station driver] had performed this service for [owner] on many previous occasions."

Here, Great Central seeks to avoid the impact of the foregoing decisions by arguing Mrs. Weston's occupation had nothing to do with her driving the Cadillac and that the delivery of automobiles by the Weston service station was not an integral part of the station's operation—that when cars were delivered it "was done as an accomodation for which no charge was made." Great Central's arguments must fail in view of the facts found by the trial court, and which in our view are supported by the evidence. Mrs. Weston had admittedly invested her own funds in the service station venture. She regularly performed various duties in connection with the station's operation, including the picking up and delivery of customer's automobiles. The pickup and delivery service was incidental to the operation of the service sta-

tion and not only was this feature advertised as a part of its business, it was undenied that this "accomodation" had been carried on by Mr. Weston since he took over the station some two years earlier.

"Whether this accident arose out of the operation of the service station must depend upon the circumstances of the particular case, the nature of the transaction, its connection with the business and whether it can be said to be a natural and necessary incident or consequence of the operation of the service station even though not a foreseen or expected consequence of that operation." State Farm Mutual Auto. Ins. Co. v. Mid-Continent Cas. Co., 378 S.W.2d 232, 236 (Mo.App.1964). It was customary for the Weston service station, for good will and other business reasons, to pick up and following service or repair of automobiles to deliver them back to customers. "A local delivery of automobiles after having been repaired may well be said to arise out of the repair business; and the fact that it is to be made at a distance does not necessarily lead to an opposite conclusion." Allen v. Travelers Indemnity Co., 108 Vt. 317, 187 A. 512, 514 (1936).

Here, the owner of the service station agreed with the owner of the automobile to take the car to the station and, for pay, repair and service it, and then deliver and park the car at one of two designated places. The car had been repaired and serviced and was in the process of being delivered, per agreement, when the collision occurred. The driver of the car (Mrs. Weston) was delivering the car at the request and direction of the station operator. This was not an uncommon duty for this particular driver and the fact that the car's owner was married to her daughter does not alter or change the situation. The delivery of the Cadillac was an integral part of the service offered by the service station and we hold that at the time of the collision the driver (Mrs. Weston) was "employed or otherwise engaged in an automobile business" of "repairing, servicing . . . motor vehicles" within the exclu-

sions in the GEICO and State Farm policies. Also see: Ocean Accident & Guarantee Corporation v. Blackstock, 165 Va. 98, 181 S.E. 364 (1935); Northern Assurance Co. v. Truck Ins. Exch., 151 Mont. 132, 439 P.2d 760 (1968); Northwestern Nat'l Cas. Co. v. Safeco Ins. Co. of America, 121 Ga.App. 209, 173 S.E.2d 407 (1970); Providence Washington Ins. Co. v. Glens Falls Ins. Co., 114 N.J.Super. 350, 276 A. 2d 386 (1971).

We further hold that the trial court did not err in its determination that Great Central's garage liability policy affords coverage to Mrs. Weston in her operation of the Cadillac. As we have demonstrated, supra, at the time of the collision the Cadillac was being driven "in connection with garage operations" of the Weston service station—garage being defined as "repair shop" or "service station," and garage operations being defined as "the ownership, maintenance or use of the premises for the purpose of a garage and *all operations necessary or incidental thereto*." (our emphasis) Mrs. Weston was, undeniably, driving the Cadillac with the permission and at the direction of the named insured (Mr. Weston) and under the authorities, supra, such use of the car was necessary or incidental to the service station operations. Both by custom and agreement, the delivery of the car, following repairs and service, was necessary and incidental to the operation of the station. Thus, cases such as Andres v. Cox, 223 Mo.App. 1139, 23 S.W.2d 1066 (1930), and Arditi v. Brooks Erection Co., 266 S.W.2d 556 (Mo.1954), relied upon by Great Central are not applicable.

The judgment of the trial court is affirmed.

HOGAN, C. J., TITUS, J., and REINHARD and CONLEY, Special Judges, concur.

STONE, J., not sitting.

FLANIGAN, J., not participating because not a member of this Court at the time the cause was submitted.