Kathy RINEHART, Nolan Loney, and
Nelson Loney, Appellants,

v.

Theodore K. ANDERSON, Defendant, The
Cincinnati Insurance Company,
Respondent.

No. WD 55604.

Missouri Court of Appeals,
Western District.

Dec. 22, 1998.

Motion for Transfer Denied Feb. 2, 1999.

Robert Cowherd, Thomas N. Chapman, Chapman, Cowherd, Turner & Tschannen, P.C., Chillicothe, for appellants.

John E. Franke, Lawrence P. Warshaw, for respondent.

Before Presiding Judge ALBERT A. RIEDERER, Judge HAROLD L. LOWENSTEIN and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Plaintiffs–Appellants Kathy Rinehart, Nolan Loney and Nelson Loney settled a claim they had brought against Theodore Anderson for the wrongful death of their mother, and then brought this garnishment action against Defendant–Respondent Cincinnati Insurance Company ("Cincinnati"), seeking to recover under a Garage Policy which Cincinnati had issued to Mr. Anderson. Plaintiffs alleged that Cincinnati's Garage Policy provided coverage for Mr. Anderson for the automobile accident in which their mother had been killed, and that Cincinnati was therefore liable to pay the $350,000 judgment they had obtained against Mr. Anderson based on a settlement under Section 537.065 RSMo 1994. Cincinnati moved for summary judgment on the grounds that no coverage was provided for the accident under its policy because: 1) the Ford van which Mr. Anderson was driving did not fit within the definition of a "covered auto" as defined in the Garage Policy; 2) the separate provision granting coverage for garage operations involving "other than covered autos" did not apply to the van, because the policy implicitly did not supply any coverage for autos other than those defined as "covered autos;" and 3) the use of the van at the time of the accident was not necessary or incidental to the garage business and therefore did not fall within the definition of garage operations.

While we agree that the Ford van was not a covered auto under the policy, in that it did not come within the policy's definition of either a "hired auto" or a "non-owned auto," we find that the van would be covered under the garage operations coverage provision as an "other than covered auto," if it was being used incidental to garage operations. We further reject Cincinnati's arguments that plaintiffs' right to coverage was voided by Mr. Anderson's entry into an allegedly collusive settlement with them and Allied, as we find that the settlement was made in accordance with the provisions of Section 537.065. Moreover, substantial evidence supported the

amount of the $350,000 judgment entered by the trial judge after an evidentiary hearing, and we therefore reject Cincinnati's claim that the settlement amount was unreasonable. Accordingly, we reverse the grant of summary judgment to Cincinnati and remand for further proceedings to determine whether the Ford van was being used incidental to garage operations.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Roberta Loney was killed on March 11, 1994, when she was struck by a 1983 Ford van operated by Mr. Anderson and owned by him and his wife as tenants by the entirety. At the time of the accident, Mr. Anderson was the sole proprietor of a service station known as "Ted Anderson dba Anderson Service Station" in Chillicothe, Missouri. His wife, Shirley, was employed by the service station, although she was not at work on the day of the accident.

Mr. Anderson carried a personal auto policy covering the van issued by Allied Insurance Company (hereinafter "Allied") with a $50,000 limit of liability per person. Mr. Anderson also carried a Garage Liability policy issued by Cincinnati which was in force on the date of the accident. This is the policy which is at issue here. It provided $300,000 in coverage for claims involving "covered autos." The "covered autos" section of the policy contained its own definition of insured; insureds under that section included both the named insured—Mr. Anderson—as well as anyone else using the auto with his permission, with certain limited exceptions. The policy also, separately, provided $300,000 in liability coverage for the "insured" for " 'garage operations' other than 'covered autos.' " The definition of "insured" for purposes of garage operations other than covered autos was narrower, and included only the named insured—again, Mr. Anderson—and his "partners, employees, directors or shareholders but only while acting within the scope of their duties."

On March 11, 1994, Mr. Anderson's aunt, Emily Anderson, brought her car into the garage for repair. Mr. Anderson's employees worked on Ms. Anderson's vehicle during the course of their employment. Because the repairs were minor, however, in accordance with his normal policy, Mr. Anderson did not charge for his work.

Once the repairs were completed, Mr. Anderson asked one of his employees, Jerry Dysart, to return the vehicle to his aunt, with Mr. Anderson following behind in the 1983 Ford van. After the repaired vehicle was delivered to its owner, the two men returned to the station in the Ford van. Mr. Anderson had pulled into a parking stall on the street adjoining the garage, but had not yet turned off the engine, when he noticed that the van was low on gas. He therefore began backing the van out of the parking spot to get fuel at the garage. As he did so, he struck and killed Roberta Loney.

Plaintiffs–Appellants are the children of Roberta Loney. They commenced a wrongful death suit against Mr. Anderson. Mr. Anderson demanded that Cincinnati provide a defense and coverage, but Cincinnati denied it had a duty to defend and denied that its policy provided coverage, claiming that the policy only covered "covered autos" and the vehicle in question was not a "covered auto." Mr. Anderson also made a claim against Allied on his separate policy with it, and it provided counsel to defend Mr. Anderson in the wrongful death action.

Prior to the commencement of trial, Mr. Anderson, plaintiffs and Allied entered into an agreement pursuant to Section 537.065, under which Allied agreed to pay plaintiffs one-half of its $50,000 policy limits up front, and the remainder only if Cincinnati's policy was adjudged to provide no coverage for the accident. As permitted by Section 537.065, Mr. Anderson in return agreed to allow a default judgment to be taken against him, and plaintiffs agreed to execute any judgment only against the Cincinnati garage policy. Mr. Anderson notified Cincinnati of his intention to enter into this agreement, and later provided notice and a copy of the agreement after its execution.

Pursuant to the agreement, the Circuit Court of Livingston County, Missouri, entered a default judgment against Mr. Anderson on the issue of liability. It then

conducted a damages hearing at which it heard evidence about decedent's pain and suffering and medical expenses before her death and about the loss to her family from her death. Plaintiffs requested $500,000 in damages. Defendants argued damages should be limited to $70,000 to $80,000, the amount counsel for Mr. Anderson had indicated he believed the case might be worth in settlement. The court ultimately entered a $350,000 judgment against Mr. Anderson.

Plaintiffs brought this action to recover from Cincinnati on Mr. Anderson's Garage Policy with it. They alleged that the van was a "covered auto" as defined in the policy, in that it was either a "hired auto" or a "non-owned auto." Alternatively, they claimed that it was covered under the "garage operations—other than covered autos" provisions of the policy because it was being used incident to garage operations at the time of the accident which killed the decedent. Cincinnati denied that the van was either a hired or a non-owned auto, noting it was jointly owned by Mr. Anderson and his wife, and asserted that the coverage for "garage operations—other than covered autos" did not apply to any automobiles of any type.

The trial court entered summary judgment for Cincinnati, finding no coverage under the policy. This appeal followed.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, discovery, and affidavits reveal no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 74.04(c); *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 380 (Mo. banc 1993). "The propriety of summary judgment is purely an issue of law which we review de novo on the record submitted and the law." *Bonds v. Missouri Dep't of Mental Health,* 887 S.W.2d 418, 421 (Mo.App.1994).

We review the grant of summary judgment by looking to the entire record to determine whether there is any issue of material fact and whether the moving party was entitled to judgment as a matter of law. *Dial v. Lathrop R–II Sch. Dist.,* 871 S.W.2d 444, 446 (Mo. banc 1994). We view the record in the light most favorable to the party against whom summary judgment was entered, but will affirm if the judgment is sustainable as a matter of law under any legal theory. *ITT Commercial Fin. Corp.,* 854 S.W.2d at 376.

## III.  PROVISION OF COVERAGE UNDER THE "COVERED AUTOS" OR "GARAGE OPERATIONS—OTHER THAN COVERED AUTOS" PROVISIONS OF THE POLICY.

*A.  The Ford Van is Not a Covered Auto Since it is Not a Specifically Described Auto, a Hired Auto or a Non–Owned Auto as Defined in the Policy.*

Plaintiffs first claim that summary judgment was inappropriate because the 1983 Ford van being driven by Mr. Anderson was a "covered auto" under the provisions of the Garage Policy. The liability coverage provisions of the policy for "covered autos" stated:

**"GARAGE OPERATIONS"—COVERED "AUTOS"**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and ***resulting from "garage operations" involving the ownership, maintenance or use of covered "autos."***

(emphasis added).

Whether this coverage applies to the Ford van necessarily depends on whether it falls within the definition of "covered autos." The policy terms permit the insured to choose one or more of 11 possible definitions of what types of autos are to be included within the term "covered autos," represented by symbols 21 through 31, with the size of the premium depending on the breadth of coverage chosen. Thus, for example, the insured could choose to have "covered autos" include "any auto," "owned autos only," "owned private passenger autos," and so forth.

Here, Mr. Anderson did not choose the "any auto" coverage provision. Rather, he chose to have three specific types of autos included within the definition of "covered autos:" These were the categories of "specifi-

cally described autos," "hired autos," and "non-owned autos used in your garage business." The relevant provisions of the Policy provide the following definitions of these three categories of autos:

### SECTION I—COVERED AUTOS

. . . .

27 = SPECIFICALLY DESCRIBED "AUTOS". Only those "autos" described in ITEM SEVEN of Non–Dealers' and Trailer Dealers' Supplementary Schedule or ITEM TEN of the Dealers Supplementary Schedule for which a premium charge is shown (and for Liability Coverage and "trailers" you don't own while attached to a power unit described in ITEM SEVEN or ITEM TEN).

28 = HIRED "AUTOS" ONLY. Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your employees or members of their households.

29 = NON–OWNED "AUTOS" USED IN YOUR GARAGE BUSINESS. Any "auto" you do not own, lease, hire, rent or borrow used in connection with your garage business described in the Declarations. This includes "autos" owned by your employees or members of their households while used in your garage business.

Accordingly, the symbols 27, 28 and 29 were entered on the declarations page next to the word "liability" and under the column entitled "covered autos." If plaintiffs are entitled to coverage under this section of the policy, they thus must show that the Ford van was either a specifically described auto, a hired auto, or a non-owned auto used in Mr. Anderson's garage business.

■ Mr. Anderson admits that the Ford van is not specifically described in the policy. He contends, however, that it does fall within the definition of a "hired auto" because it was not owned by him, but rather that he and his wife owned it as tenants by the entirety. He asserts that this "creates a distinct ownership from that of Defendant Anderson as an individual . . . It therefore follows that use of the 1983 Ford Van constituted a borrowing from the entirety of its ownership interest in the Van."

■ This argument is utterly without merit. Tenancy by the entirety is a form of ownership in property created by marriage in which each spouse owns the entire property, rather than a share or divisible part, and thus at the death of a spouse, the surviving spouse continues to hold title to the property. *State ex rel. State Hwy. Com'n v. Morganstein,* 649 S.W.2d 485, 488 (Mo.App.1983). Thus, both Mr. Anderson and his wife owned an indivisible part of the van. Since Mr. Anderson owned the van, he did not hire it, and it is not a hired auto. Moreover, both Mr. Anderson and his wife worked for the company, and both Mr. Anderson and his wife are members of the same household. The policy specifically states that "Hired Autos" does not include any auto leased, borrowed, etc. from any employee or members of their households. Since Mr. Anderson's wife was an employee of the garage and they are members of the same household, the van is not a hired auto.

Mr. Anderson's argument that the van was a "non-owned Auto" similarly depends on the argument that, because he and his wife own the van as tenants by the entirety, it is not owned by him personally. For the reasons just stated, that argument is without merit. Accordingly, we also find that no coverage is provided for the Ford van under the "non-owned auto" provision of the "covered autos" portion of the policy.

*B. The Garage Operations Portion of the Policy Does Grant Coverage for Autos which Are Not Covered Autos But Are Used in Garage Operations*

■ The fact that the van was not a covered auto did not entitle defendants to summary judgment, however. We agree with plaintiffs that coverage for the van may have been provided by those policy provisions governing coverage for "garage operations—other than 'covered autos.'"

The relevant portion of the policy provides:
**"GARAGE OPERATIONS"—OTHER THAN COVERED "AUTOS"**

*We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies caused by an "accident" and resulting from "garage operations" other than the ownership, maintenance or use of covered "autos."*

(emphasis added). As discussed in detail above, and as Cincinnati contends, the Ford van is not a "covered auto." Thus, on its face, the above provision appears to provide coverage for the van if the van was used in garage operations, for the provision states that the insurer will pay all sums the insured is legally obligated to pay for bodily injury "resulting from garage operations other than the ownership, maintenance or use of covered 'autos.'" Cincinnati argues, however, that the definition of garage operations does not include use of any autos other than covered autos.

> The policy defines "garage operations" as:
>
> the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. "Garage operations" includes the ownership, maintenance or use of the "autos" indicated in SECTION I of this Coverage Form as covered "autos." **"Garage operations" also include all operations necessary or incidental to a garage business.**

(emphasis added). This definition does not support Cincinnati's argument. By its terms, garage operations are defined to include both the ownership, maintenance or use of covered autos, and to "also include all operations necessary or incidental to a garage business." Therefore, if a non-covered auto is used in an operation necessary or incidental to the garage business, it would be

reasonable for an insured to believe that it comes within this coverage provision.

Cincinnati argues that this is not what it intended by this provision, and that it intended that non-covered autos were not to be provided with any coverage at all. If Cincinnati intended the policy to exclude coverage for any auto that was not a covered auto, however, it could and should have so stated, by, for instance, stating that there would be coverage for liability resulting from garage operations involving covered autos and "garage operations other than the ownership, maintenance or use of **ANY** automobile." Instead, the policy stated that it provided coverage for garage operations involving covered autos and that it provided a separate coverage for garage operations involving the use of "other than covered autos." An auto that is not a covered auto would therefore seem to fit within this coverage provision.

Cincinnati contends that the latter reading of the coverage of garage operations is unreasonable, for it would make no sense for Cincinnati to carefully limit the definition of covered autos in one section, and then provide coverage for all other autos in the following section. We do not agree that the coverages provided by the two sections are the same. Rather, a review of the policy reveals that the definition of insured for claims involving covered autos is broader than the definition of insured for claims involving garage operations-other than covered autos.[1] Moreover, the policy allows the insured to select different coverage levels for covered autos coverage than for garage operations involving other than covered autos, and presumably the premium to be charged would be varied accordingly. Thus, it does make sense that the insured might want to purchase extensive coverage for certain—i.e., covered autos, and that the insured would

---

1. With certain limited exceptions, the definition of insured for covered autos coverage states that:
   a. The following are 'insureds' for covered 'autos:'
   (1) You for any covered 'auto'.
   (2) Anyone else while using with your permission a covered 'auto' you own, hire or borrow except: (exceptions omitted)
   (3) Anyone described above liable for the conduct of an 'insured' but only to the extent of that liability.

The definition of insured for other than covered autos coverage is narrower. It provides that:
   b. The following are 'insureds' for 'garage operations' other than covered 'autos'.
   (1) You.
   (2) Your partners, employees, directors or shareholders but only while acting within the scope of their duties.

also desire the separate, narrower coverage provided for other aspects of garage operations, including those aspects of the operations which involve use of automobiles which do not fall within the definition of covered autos.[2]

At a minimum, the policy language lends itself to two different interpretations and thereby creates an ambiguity regarding coverage of such automobiles. "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Peters v. Employers Mut. Cas. Co.*, 853 S.W.2d 300, 302 (Mo. banc 1993). Since Missouri law is well-settled that ambiguities in an insurance policy will be construed against the insurer, *see, e.g., Universal Underwriters Ins. v. D. Johnson*, 905 S.W.2d 529, 533 (Mo.App.1995), we find that the trial court erred insofar as it determined that the Ford van was not covered under the policy because it did not fall within the definition of " other than covered autos." [3]

*Farmers Alliance Mutual Insurance Co., v. Reeves*, 775 P.2d 84 (Colo.App.1989), reached the same result in interpreting identical policy provisions. That court was asked to interpret a garage liability policy which also contained provisions for coverage for covered autos and a separate provision for coverage for garage operations involving other than covered autos, similar to the one at issue here. Moreover, the pertinent definition of "garage operations" mirrored the definition of "garage operations" at issue here, stating that garage operations "also include all operations necessary or incidental to a garage business." *Id.* at 86. And, similarly

to the situation here, in that case the insurance company had denied coverage of injuries to a young trespasser caused by the insured's rental vehicle, claiming that the vehicle did not come within the definition of covered auto and that the provision of coverage for garage operations other than covered autos applied only to non-auto related claims.

Focusing on the portion of the definition of garage operations that states, "garage operations also include all operations necessary or incidental to a garage business," *Farmers* rejected the claim that autos other than covered autos were not provided coverage. It held that, because the insured used the rental vehicle in which the injury occurred at the garage and the presence of the rental vehicle at the garage for the purpose of maintenance or repair was necessary and incidental to the *operation* of the garage business, the accident clearly resulted from garage operations. Therefore, "since the policy clearly contemplates coverage for garage operations involving other that covered autos, any argued limitation to "covered autos" under the policy definition of garage operations is without merit." *Farmers*, 775 P.2d at 86.

We find the rationale of *Farmers* persuasive, and apply it here. The policy on its face states that it provides coverage for certain types of autos which are defined as "covered autos," and that it also provides separate coverage for garage operations involving "other than covered autos" and defines garage operations as including both covered autos and "all operations necessary or incidental to a garage business." The Ford van is not a covered auto. It is thus an

---

**2.** Cincinnati also notes that *American Economy Ins. Co. v. Otte,* 869 S.W.2d 179 (Mo.App.1993), found that there was no coverage where the insured had the option to purchase liability coverage in addition to coverage for "non-owned vehicles," but the insured chose not to do so. It argues that here, too, Anderson could have selected and purchased liability coverage for all autos, or could have specifically listed his personal automobile if he desired coverage, and having failed to do so, he should not be accorded coverage under the "other than covered autos" provisions of the policy. However, in *Otte,* unlike here, it does not appear that the policy provided separately stated coverage for garage operations not fitting within the definition of covered autos, with a separate definition of insured under the latter coverage and with provi-

sion for different liability limits. *Otte* is not controlling.

**3.** While, as Cincinnati notes, the coverage page does state under "Schedule of Coverages" that "Each of these coverages will apply only to those "autos" shown as covered "autos" for a particular coverage," this language is nowhere repeated in either the coverage or definitional sections, or in any labeled exclusions. The coverage sections clearly provide coverage for both "Covered Autos" and for "Other than Covered Autos" as long as they arise out of garage operations. At best, the statements on the declarations page raise an ambiguity which, as just noted, must be resolved in favor of the insured.

"other than covered auto." It is therefore within the coverage provisions if it was being used in operations necessary or incidental to the garage business at the time of the accident. Had the insurer not wanted other than covered autos to be included within this definition of garage operations, it could have easily accomplished this result by stating that the garage operations coverage was limited to coverage for covered autos and garage operations other than those involving any auto. It did not do so.

*C. Cincinnati was Not Entitled to Summary Judgment Because There Remains a Genuine Issue of Fact as to Whether Mr. Anderson's Use of the Van was Necessary or Incidental to the Garage Business.*

■ Cincinnati also argues that no coverage was provided by the policy because the Ford van was not in fact being used in operations necessary or incidental to Mr. Anderson's garage business, as required to come within the definition of "garage operations." Prior cases have held that the determination whether an accident arose out of the operation of a service station "must depend upon the circumstances of the particular case, the nature of the transaction, its connection with the business and whether it can be said to be a natural and necessary incident or consequence of the operation of the service station even though not a foreseen or expected consequence of that operation." *State Farm Mut. Auto. Ins. Co. v. Mid–Continent Cas. Co.,* 378 S.W.2d 232, 236 (Mo.App.1964). We thus look at the particular facts which formed the basis of the summary judgment motion below.

Those facts, construed favorably to the non-moving party, show that Mr. Anderson's aunt, Emily Anderson, brought her car into the garage for repair. Mr. Anderson's employees worked on her vehicle during the course of their employment, but there were no charges for the work because they simply made a minor adjustment to a belt. Mr. Anderson testified it was not unusual for him not to charge a regular customer, such as his aunt, if no substantial work was performed, and that he normally did not make a separate charge for delivery or pickup of a vehicle in order to build goodwill. His aunt was a regular customer and he maintained an open and running account for her. After the work on Ms. Anderson's car was completed, Mr. Anderson asked one of his employees, Jerry Dysart, to return the vehicle to his aunt, with Mr. Anderson following behind in the 1983 Ford van. At the end of the return trip to the station after delivering the car, he saw the van was low on gas. He testified at his deposition that he needed gas in case he needed to do "other garage-related trips later that afternoon."

Based on this evidence, a jury could find that Mr. Anderson's return trip from delivering his aunt's vehicle and his attempt to get gas for the van at the end of that trip was "necessary or incidental to a garage business." Indeed, as the court noted in *Weston v. Great Central Insurance Co.,* 514 S.W.2d 17, 24 (Mo.App.1974), the "local delivery of automobiles after having been repaired may well be said to arise out of the repair business." *Weston* so held even though there, as here, the delivery was accomplished as an accommodation to the owner of the car, for good will purposes, and no charge was made for it.[4]

Here, as in *Weston,* the facts would support a determination that the accident occurred incidental to the garage business in that it occurred on the street abutting the business at the close of a business trip to return a vehicle to a customer, in the course of what Mr. Anderson says was an effort to obtain gas so that the vehicle could be available for further business use if needed. Accordingly, Cincinnati was not entitled to summary judgment on the ground that the van

---

**4.** *See also American Hardware Mut. Ins. Co. v. Darv's Motor Sports, Inc.,* 427 N.W.2d 715, 718 (Minn.App.1988) (particular type of motor bike was being used incidental to garage operations even though child was driving it to friend's house to play where in so doing she was promoting use of such bikes by children, a promotional use which the owners specifically contemplated).

*Compare Lonergan v. Nationwide Mut. Ins. Co.,* 663 A.2d 480, 483–84 (Del.Super.1995) (recognizing that a vehicle will be covered under this provision if it is being used for a business purpose, but finding that the vehicle was being used for a purely personal purpose at the time of the accident in question).

was not covered under the garage operations—other than covered autos portion of the policy.

## V. COLLUSIVE SETTLEMENT

Cincinnati argues that, even if coverage was provided under its policy, as a matter of public policy it should be denied here, and the policy coverage declared void, because its insured entered into a collusive settlement with the plaintiffs and Allied, in violation of the following provision of the Policy:

**CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Form is void in any case of fraud by you at any time as it related to this Coverage Form. It is also void if you or any other "insured," at any time, intentionally conceal or misrepresent a material fact concerning:

a. This Coverage Form;

b. The covered 'auto';

c. Your interest in the covered 'auto';

d. A claim under this Coverage Form.

■ It is undisputed that Mr. Anderson entered into an agreement pursuant to Section 537.065 with the plaintiffs and Allied, under which Allied agreed to pay plaintiffs one-half of its policy limits up front, and the remainder only if Cincinnati's policy was adjudged to provide no coverage for the accident. Also pursuant to the agreement, Mr. Anderson agreed to allow a default judgment to be taken against him, and plaintiffs agreed to execute any judgment only against the Cincinnati garage policy.

Section 537.065 RSMo (1994) provides in relevant part:

Any person having an unliquidated claim for damages against a tort-feasor, on account of bodily injuries or death, may enter into a contract with such tort-feasor or any insured in his behalf or both, whereby, in consideration of the payment of a specified amount, the person asserting the claim agrees that in the event of a judgment against the tort-feasor, neither he nor any person, firm or corporation claiming by or through him will levy execution ... except against the specific assets listed in the contract and except against any insurer

which insures the legal liability of the tort-feasor for such damage ...

■ As plaintiffs note, entry into a Section 537.065 settlement is not itself fraudulent and does not void a policy where the insurer has refused to defend or provide coverage. To the contrary, *Cologna v. Farmers & Merchants Ins. Co.*, 785 S.W.2d 691 (Mo.App. 1990), held that "an insurer's unjustified refusal to defend upon the ground that the claim is not covered by the policy relieves the insured from his contractual obligation not to settle and the insured is at liberty to make a reasonable settlement" following the procedure set out in Section 537.065. *Id.* at 701. We find *Cologna* applicable here.

We are not required to reach a contrary result simply because Cincinnati says that the settlement prejudiced it because its coverage was excess to that provided by Allied, yet under the agreement defendant agreed to collect only one-half of Allied's policy limits from Allied before collecting from Cincinnati. However, there has been no determination by any court as to which company's coverage was primary and which was excess, or as to whether both were primary, or as to whether defendant's agreement to this effect is binding on it if its coverage is indeed excess. Thus, there has been no showing of prejudice. Moreover, the premise of Section 537.065 is that, where an insurer unjustifiably declines to provide coverage, and refuses to defend, its insured is justified in reaching a settlement which enables the insured to be released from personal liability. Cincinnati cannot have its cake and eat it too by both refusing coverage and at the same time continuing to control the terms of settlement in defense of an action it had refused to defend. An insured, "although not engaging in collusive conduct for fraudulent or deceitful purpose, may act in a self-interested way in an attempt to protect himself from personal liability." *Gulf Ins. Co. v. Noble Broadcast*, 936 S.W.2d 810, 816 (Mo. banc 1997). That principle applies here.

■ Cincinnati also argues that the $350,-000 in damages awarded by the court was excessive and unreasonable, and that as a result Cincinnati had no obligation to indem-

nify Mr. Anderson for that amount. In particular, it says that, since counsel for Mr. Anderson thought the settlement value of the case was no more than $85,000, that amount provides the upper limit for a reasonable settlement.

■ We agree with Cincinnati that the Missouri Supreme Court held in *Gulf Insurance* that "a reasonableness standard is appropriate in determining the enforceability of Section 537.065 settlements," 936 S.W.2d at 815, and that "the test of whether the settlement amount is reasonable is what a reasonably prudent person in the position of the defendant would have settled for on the merits of the plaintiff's claim." *Id.* at 816. In *Gulf Insurance*, the parties to the settlement agreed to a consent judgment for $1,000,000 against the non-settling insurer, despite the fact that the total damages were $12,072.79, only ½₂ of the settlement amount, that plaintiff's counsel had made a demand for only $295,000, and that defense counsel had estimated the settlement value of the case at no more than $75,000. When the plaintiffs later tried to collect the $1,000,000 against the insurer, the insurer claimed it was unreasonable, relying on the facts just recited, without objection by plaintiffs to the court's consideration of rejected settlement offers. On these facts, *Gulf Insurance* properly held that the trial court had been within its discretion in finding the $1,000,000 settlement amount unreasonable and unenforceable.

We disagree that, in so doing, the Supreme Court held that a reasonable settlement can never be for more than the amount defendant's counsel suggested that the court should award. As is self-evident, all of the parties to a suit will posture themselves in the way they believe to be favorable to their positions. Not every defense attorney will agree as to the value of a case, and other parties, and the court, may value a case differently yet based on the same facts. *Gulf Insurance*, did not say that a court can award no more than a particular defense attorney offered; it said the settlement should be for no more than a hypothetical reasonably prudent defendant would actually settle for. Indeed, *Gulf Insurance* did not limit the plaintiffs in that case to any particular settlement offer; it simply directed the trial court on remand to hold an evidentiary hearing and to determine what would be a reasonable settlement amount.

■ In the instant case, the parties followed the approach recommended by *Gulf Insurance* in the first instance. Rather than trying to agree on a value of the plaintiffs claims themselves, they agreed on liability and then submitted the issue of a reasonable damage amount to the trial court. That court held a hearing at which plaintiffs presented evidence of out-of-pocket medical and funeral expenses of $7,602.08, pain and suffering, loss of companionship, and similar matters. They requested damages totaling $500,000. Cincinnati noted that Mr. Anderson's counsel had believed that the case might settle for $85,000 and suggested that this was therefore the upper limit of reasonableness of any settlement, and otherwise argued for low damages. The court considered all of this evidence and made a specific determination that $350,000 was a reasonable amount at which to settle the case. This was less than demanded by plaintiffs, and far less than has been awarded in other wrongful death cases.[5] While Cincinnati notes that the amount of the award matches the total of the two insurance policies, there is no evidence that this was the reason for the court's award. It was within the amount supported by the evidence. We do not find it so high as to be unreasonable and unenforceable. Accordingly, the amount of the settlement was not unreasonable and did not provide the court below with a basis to grant defendant summary judgment in this garnishment action.

For the reasons stated above, we reverse the grant of summary judgment and remand for a determination whether Mr. Anderson was in the process of an operation necessary or incidental to his garage operations at the

**5.** *See Barnett v. La Societe Anonyme Turbomeca,* 963 S.W.2d 639 (Mo.App.1997); *Letz v. Turbomeca Engine Corporation, et al.,* 975 S.W.2d 155 (Mo.App.1997); *Blum v. Airport Terminal Services, Inc.,* 762 S.W.2d 67 (Mo.App.1988).

time of the accident, and for further proceedings in accordance with this opinion.