Linda NACHTWEIH, Appellant,

v.

L.M. MARAVILLA, M.D., Respondent.

No. 62188.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 24, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 29, 1993.

Marc Steven Wallis, St. Louis, for appellant.

Donald Paul Myre, St. Louis, for respondent.

CRAHAN, Judge.

Plaintiff Linda Nachtweih ("Plaintiff") appeals from a judgment entered pursuant to a jury verdict in favor of Defendant L.M. Maravilla, M.D. ("Defendant") in a negligence action seeking damages for failure to diagnose her pregnancy. The sole issues on appeal are whether the trial court erred in allowing a deposition to be read to the jury pursuant to Rule 57.07(a)(2) and, if so, whether the error was sufficiently prejudicial to warrant a new trial. We hold that admission of the deposition was error but was not sufficiently prejudicial to warrant a new trial.

Plaintiff initially filed suit for medical negligence in 1984. Included as defendants in the original suit were Defendant, Dr. Maravilla; St. Anthony's Medical Center; Dr. Dennis McGraw, another physician Plaintiff had been seeing for several years; and Dr. Joseph Boveri, a physician that Plaintiff claimed to have seen for the insertion of an IUD. In the course of this initial suit, Plaintiff took the depositions of these defendants. The original suit was ultimately dismissed without prejudice in 1987. Plaintiff refiled suit in 1988 pursuant to § 516.230 RSMo 1986, naming only Dr. Maravilla and St. Anthony's as defendants. By the time of trial, only Dr. Maravilla remained as a defendant.

The case proceeded to trial on March 2, 1992 and resulted in a jury verdict in favor of Defendant. The nature of our holding requires that we recite the evidence in some detail.

The record establishes that Defendant was a family practitioner who had been practicing in St. Louis County for over twenty-five years. His practice did not include providing prenatal care to pregnant women or delivering babies. Plaintiff had been seeing Defendant as her family physician since March, 1981. Defendant had treated Plaintiff for a variety of maladies, including hypertension, headaches and stomach problems, for which he prescribed various medications. Plaintiff was also seeing Dr. McGraw, who sometimes prescribed medications for her as well. Neither Defendant nor Dr. McGraw was aware Plaintiff was seeing and receiving treatment from the other.

In September of 1982, Plaintiff went to Defendant's office complaining of stomach cramps. His office records establish that at that time she weighed 245½ lbs. and was twenty-two years old. She was not then pregnant.

Plaintiff became pregnant in October of 1982. Plaintiff testified that she did not know she was pregnant and claimed to have experienced normal menstrual periods throughout the entire term of her pregnancy. However, Dr. McGraw testified in his deposition, introduced by Plaintiff, that Plaintiff came to see him in November of 1982 because she was concerned about having missed her period. Dr. McGraw testified that he examined Plaintiff and recommended that she return in a few weeks if her cycle did not return to normal. Although Plaintiff testified that she did in fact return to see him on several occasions after that date, Dr. McGraw testified that he never saw Plaintiff again until July 13, 1983, shortly before she gave birth. Dr. McGraw's office records, which were admitted into evidence, supported his testimony.

Plaintiff did not return to see Defendant until March of 1983. At that visit, she complained only of a stiff neck and a headache, for which Defendant prescribed some pain relievers and muscle relaxants. Plaintiff

gave no indication to Defendant that she believed she might be pregnant.

Plaintiff testified that she returned to see Defendant three or four times after her visit in March. However, similar to Dr. McGraw, Defendant testified that he never saw or treated Plaintiff during that time period and first saw her again when she came to his office on July 15, 1983. Defendant's office records supported his testimony.

On July 13, 1983, Plaintiff went to Dr. McGraw complaining of muscle spasms and pain in her lower back. Dr. McGraw prescribed Motrin and Norflex, advised her to apply heat packs and ice bags alternately, and told her to return in five days if not completely better. On July 15, 1983, Plaintiff called Dr. McGraw's office and stated she was still having severe pain. Dr. McGraw telephoned the Normandy Osteopathic Hospital South to schedule Plaintiff's admission for that day.

Instead, on that same day, Plaintiff went to see Defendant, this time complaining of lower back pain. Defendant found Plaintiff to be in such obvious and severe pain that he was unable to perform a physical examination. Instead, he ordered Plaintiff admitted to St. Anthony's Medical Center for x-rays. Hospital records for that date indicate Plaintiff weighed 250 lbs., a 4½ lb. gain from her September 1982 visit to Defendant. The diagnosis of pregnancy was made when an x-ray of Plaintiff's spine revealed the presence of a mature fetal skeleton.

Plaintiff gave birth to a baby girl by cesarean section the following day, July 16, 1983. The baby was born with meconium staining and experienced respiratory problems. For treatment of these problems, the baby was transferred to Cardinal Glennon Hospital where she was hospitalized for thirty-seven days. There was no evidence of any permanent injury and the child was healthy at the time of trial.

Plaintiff's theory of recovery was that Defendant was negligent in failing to diagnose her pregnancy and that the failure to diagnose pregnancy until the date of delivery directly caused or contributed to cause the problems which led to the baby's subsequent hospitalization. The hospitalization resulted in medical bills of nearly $48,000 and caused Plaintiff to be separated from her child until Plaintiff's discharge from St. Anthony's Medical Center on July 21, 1983. Plaintiff testified that she became depressed because of the separation.

In support of her theory, Plaintiff read to the jury the deposition testimony of her expert, Dr. Peter Kornfeld, a board certified physician in Internal Medicine. Dr. Kornfeld testified on the basis of his review of Plaintiff's medical records and a cursory review of Defendant's deposition.

Dr. Kornfeld initially criticized Defendant for ignoring Plaintiff's complaint of missing her period in November of 1982. Dr. Kornfeld was then advised that this complaint was made to Dr. McGraw and that, contrary to his assumption, Dr. McGraw and Defendant did not practice together and had no knowledge of Plaintiff's visits to the other. Dr. Kornfeld also assumed that Plaintiff must have had a significant weight gain between September, 1982 and March, 1983 when she next saw Defendant.[1]

Dr. Kornfeld opined that, in view of Plaintiff's history of hypertension, Defendant's actions fell below the applicable standard of care when he failed to perform a thorough pelvic and rectal examination when Plaintiff came to see him in March, 1983 complaining of a stiff neck and headache. According to Dr. Kornfeld, such examinations should be performed at least once a year and, if performed properly, would have revealed that Plaintiff was pregnant.

Dr. Kornfeld also faulted Defendant for failing to examine Plaintiff when she came to his office on July 15, 1983 complaining of severe lower back pain and for failing to examine her later that day, after she was admitted to the hospital. Citing undisclosed records of a visit by Plaintiff to Cardinal Glennon Hospital on July 12, 1983, of which there was no evidence whatsoever at trial,

---

1. There was no record of Plaintiff's weight in March, 1983 and Dr. Kornfeld felt there should have been. As discussed above, a comparison of Defendant's medical records and St. Anthony's medical records reflects a 4½ pound weight gain from September, 1982 to July, 1983.

Dr. Kornfeld concluded that Plaintiff had been in labor for several days prior to delivery. Although he declined to say that any problems in this particular case were caused by Defendant's failure to diagnose pregnancy in March, 1983, he did opine that there was a good possibility, if not a probability, that a diagnosis of pregnancy on July 15, 1983, the day before delivery, "would have helped." Dr. Kornfeld further testified that, to a reasonable degree of medical certainty, (1) there is a "good probability that the kind of treatment that the patient received was at least a contributing cause to the difficulties encountered subsequently;" (2) "the patient received poor care during her pregnancy and the medical care rendered was well below the prevailing and accepted medical standard;" and (3) Defendant "significantly contributed to the complication and subsequent events that occurred."

Defendant's expert, Dr. Bruce Bryan, a board certified physician in Obstetrics and Gynecology (OB–GYN), testified on the basis of his review of Plaintiff's medical records and Dr. Kornfeld's deposition. Dr. Bryan found Defendant's examination of Plaintiff in March, 1983 to be appropriate for her complaints of neck pain. He found nothing in her complaints at that time which would require a pelvic or rectal examination and felt that a physician would not get many patients if he approached neck pain in that fashion. He found no basis for concluding that any drugs prescribed by Defendant could be related to any problems Plaintiff or the baby experienced.

Based on his review of Plaintiff's medical records, Dr. Bryan found that Plaintiff's labor had proceeded satisfactorily up to a point about one and one half hours after the diagnosis of pregnancy was made by Dr. Cruz, the obstetrician Defendant called in for consultation after the presence of the fetus was disclosed by the x-rays. At that point, about three or four hours prior to delivery, the baby stopped moving through the birth canal and the need for a cesarean delivery became apparent.

Dr. Bryan testified that the respiratory and other problems experienced by the baby were the result of meconium staining. Dr. Bryan explained that this occurs when the baby empties sterile meconium from its intestines into the amniotic fluid and then ingests the meconium into the lungs with its first breath. In Dr. Bryan's experience, this occurs even in babies with good prenatal care. Further, based on notations in Plaintiff's chart that the membranes of the placenta were stained with meconium, Dr. Bryan concluded with reasonable medical certainty that the meconium was present for a long time, most likely several days.

Based on these findings, Dr. Bryan opined that an earlier diagnosis of pregnancy, even the day before delivery, would not have prevented the meconium problem that caused the infant's respiratory difficulties. In short, Dr. Bryan found no areas in which Defendant's care of Plaintiff fell below the required standard of care and concluded that the problems the baby experienced and the subsequent care the child received at Cardinal Glennon Hospital were not in any way related to Defendant's failure to diagnose Plaintiff's pregnancy.

The issue presented on appeal relates to Defendant's use of a portion of the deposition of a former defendant in the case, Dr. Boveri. At trial, Plaintiff testified on cross examination that Dr. Boveri had provided her with an IUD. During Defendant's case, over Plaintiff's objection, the trial court permitted Defendant to read a brief excerpt from Dr. Boveri's deposition in which he testified that he had no record of ever having treated Plaintiff.

■ Plaintiff's objection at trial and contention on appeal is that there was no foundation for admission of the deposition because Defendant made no showing of unavailability as required by Rule 57.07(a)(3). That rule provides that a party may use a witness's deposition at trial for any purpose if the court finds the witness is unavailable to testify. Plaintiff points out that the burden is on the party offering the deposition to show its admissibility, not on the other party to overcome an inference of unavailability. *Null v. Gray,* 534 S.W.2d 823, 826 (Mo.App. 1976). Generally, in the absence of proof that a witness is unavailable at trial, that witness's deposition is inadmissible at trial.

*DeLong v. Hilltop Lincoln–Mercury, Inc.*, 812 S.W.2d 834, 844 (Mo.App.1991). Although there is no dispute that Dr. Boveri was a practicing physician, he would not come within the exception of Rule 57.-07(a)(3)(C) without evidence and a finding by the trial court that he was "engaged in the discharge of his official or professional duty at the time of [the] trial" as further required by such exception. *Null*, 534 S.W.2d at 826.

Defendant concedes that there was no showing or finding by the trial court that Dr. Boveri was unavailable or was engaged in professional duty at the time of trial. Thus, Defendant essentially concedes that admission of Dr. Boveri's testimony was error, albeit non-prejudicial, if Rule 57.07(a)(3) was applicable. Defendant points out, however, that Dr. Boveri's deposition testimony was offered and admitted pursuant to Rule 57.-07(a)(2), not 57.07(a)(3). Rule 57.07(a)(2) provides, in relevant part, that "[t]he deposition of a party, ... may be used by an adverse party for any purpose."

The trial court found that Dr. Boveri was a party to the original suit at the time his deposition was taken by Plaintiff and that both Plaintiff and Defendant were also parties to the original action and represented by counsel. The trial court further found that the current case was refiled pursuant to the one-year savings statute and that the issues involved in the prior suit were identical to the issues in the current suit, plus additional issues present in the prior suit and later abandoned by Plaintiff. The specific subject of the excerpt from Dr. Boveri's deposition offered by Defendant to be read to the jury was whether Dr. Boveri's records reflected any treatment of Plaintiff as she had claimed. Plaintiff's counsel conceded to the trial court that this was the purpose for which Plaintiff had taken Dr. Boveri's deposition. After hearing argument on all of these points, the trial court held that the deposition should be admitted, summarizing its reasoning as follows:

> THE COURT: Well, Dr. Boveri was a party to the predecessor action, and this is, in fact, a successor action to that one. He was a party at the time the deposition was taken.... [T]he parties to this action

were present and represented by counsel and participated, or at least had the right to participate in the taking of that deposition, and I don't see why that deposition should be considered any differently than the deposition of any other party. I acknowledge that there's no law on this that I know of and that I'm making a discretionary call. And in my discretion I think it would be unfair not to permit the deposition to be read particularly in the way that this has all developed.

Defendant then read the brief excerpt from Dr. Boveri's deposition. The portion of the deposition read to the jury consisted solely of Dr. Boveri's identification and review of his office records, including his daily receipts and cash logs, and his statement that such records did not reflect the name "Linda Nachtweih" or "Linda Krause." Plaintiff's counsel was then asked by the court if he wanted any other portions of Dr. Boveri's deposition read to the jury. Plaintiff declined.

If the reading of Dr. Boveri's deposition was in fact a matter of discretion as the trial court assumed, it would be difficult to fault the court's reasoning. As Plaintiff correctly points out, however, the conditions that must be satisfied before a deposition may be admitted pursuant to Rule 57.07(a)(2) are not discretionary and those requirements were not satisfied here.

■■ The competency of a deposition is to be determined by the status of the witness at the time the deposition is offered into evidence. *Null*, 534 S.W.2d at 825 (quoting *Maplewood Planing Mill & Stair Co. v. Pennant Construction Co.*, 344 S.W.2d 629, 633 (Mo.App.1961)). Although there are apparently no cases specifically considering the application of this principle to Rule 57.-07(a)(2), cases considering Rule 57.07(a)(3) are instructive. In *Null*, for example, the court considered the admission of a physician's deposition which established that he would be engaged in surgery during the week the case was originally set for trial but did not establish the doctor's schedule for the dates on which the trial actually occurred. Although noting that the determination of a witness's availability is a factual determina-

tion resting largely within the discretion of the trial court, the court held that admission of the deposition was error where there was no evidence and no finding by the court that the witness was unavailable at the time his deposition was admitted into evidence. *Null,* 534 S.W.2d at 825–26. *See also McFadden v. McFadden,* 509 S.W.2d 795, 799 (Mo.App. 1974). Thus, although the factual determination of whether the requirements of Rule 57.07 are satisfied is a determination largely within the trial court's discretion, strict compliance with the express requirements of the rule *as of the time the deposition is offered* is not a matter of discretion.

■ As set forth above, Rule 57.07(a)(2) applies only to the deposition of "a party," and only authorizes use of such a deposition by "an adverse party." In light of the principles reaffirmed in *Null,* we hold that Rule 57.07(a)(2) must be interpreted to require compliance with these conditions at the time the deposition is offered. Here, neither condition was satisfied. At the time the deposition was offered, Dr. Boveri was no longer a "party" to the suit, nor was Defendant an "adverse party" with respect to Dr. Boveri. Thus, in the absence of any determination that Dr. Boveri was unavailable as provided in Rule 57.07(a)(3), admission of Dr. Boveri's deposition was error.

■ We must therefore consider whether admission of the deposition was sufficiently prejudicial to Plaintiff to warrant a new trial. Rule 84.13 prohibits reversal of a judgment absent a determination that error was committed by the trial court against the appellant "materially affecting the merits of the action."

Plaintiff claims that admission of the deposition clearly prejudiced her case because it adversely reflected upon her credibility. According to Plaintiff, the credibility of the parties was of "utmost importance" in the case because of the conflict between Plaintiff's and Defendant's testimony with respect to the dates on which Plaintiff received treatment from Defendant. Plaintiff claimed to have seen Defendant three or four times after March, 1983, whereas Defendant testified that he saw Plaintiff on only two occasions after she became pregnant—*i.e.,* on

March, 1983, when Plaintiff complained of a stiff neck and headache, and on July 15, 1983, the day before the diagnosis of pregnancy and delivery of the child. Defendant's office records supported his version. Plaintiff reasons that the more occasions the jury found for Defendant to diagnose the pregnancy, the greater the chance the jury would have found Defendant negligent in failing to do so.

Defendant counters this argument by drawing our attention to the wealth of other evidence impeaching Plaintiff's credibility. For example, Plaintiff herself offered Dr. McGraw's deposition in which he specifically contradicted Plaintiff's claims of having obtained treatment from him on occasions not reflected in his office records. Defendant also cites numerous instances in which Plaintiff's testimony at trial was inconsistent with her deposition testimony or with medical records she introduced into evidence. Under such circumstances, Defendant maintains that Dr. Boveri's testimony, which conflicted with Plaintiff's testimony on a collateral issue, could not have had a decisive effect on the outcome of the case.

■ Our review of the record persuades us that the erroneous admission of Dr. Boveri's deposition did not materially affect the merits of the action, but for a different reason than that advanced by Defendant. Rather, contrary to Plaintiff's assertion, we find that the *material* facts were essentially undisputed and, based on her own expert's testimony, Plaintiff's credibility with respect to the alleged additional visits to Defendant was essentially irrelevant.

In his testimony, Dr. Kornfeld was questioned about his assumption concerning Plaintiff's credibility with regard to her medical history. In a letter to Plaintiff's counsel, Dr. Kornfeld had stated that Plaintiff's "history of monthly periods, no symptoms of pregnancy along with her desire to keep the pregnancy secret, makes the entire history as given by her as [sic] suspect." Dr. Kornfeld further observed that "[t]here are no notes in the office records of patient visits between November, 1982 and March 25, 1983 and between April and July 1983, therefore the patient's allegation of further medical

visits during this interval cannot be corroborated." When questioned about these observations, Dr. Kornfeld specifically stated that he "would not believe verbatim everything that [Plaintiff] has said." Moreover, *nothing in Dr. Kornfeld's testimony purported to ascribe negligence to Defendant for failure to diagnose pregnancy in the course of the disputed visits.* Indeed, it is difficult to imagine how he could have done so in light of the fact that Plaintiff provided no dates or descriptions of what transpired or what sort of examinations, if any, Defendant performed during these alleged visits. Thus, Dr. Kornfeld's opinion with respect to Defendant's alleged failure to satisfy the required standard of care was based exclusively on the undisputed records of the visits that occurred on March 25, 1983 and July 15, 1983.

Under such circumstances, Plaintiff's credibility with respect to the disputed additional visits was immaterial. Even if the jury believed Plaintiff's testimony that the visits occurred, she failed to provide any evidence of the dates or the nature of any examinations performed and provided no expert testimony that Defendant's conduct during the alleged visits fell below the applicable standard of care or contributed to her damages. Therefore, the disputed visits, assuming they occurred, could not properly serve as the basis for a finding in Plaintiff's favor. It readily follows that the trial court's erroneous admission of Dr. Boveri's deposition with respect to a collateral matter could not have materially affected the merits of the action and does not warrant reversal of the judgment.

 Plaintiff nevertheless maintains that she was prejudiced because she was afforded no opportunity to cross examine the witness in front of the jury or to examine the witness in light of other evidence presented at trial.[2] Such contention provides no basis for a finding of prejudice. In essence, Plaintiff assumes that, had the court properly excluded Dr. Boveri's deposition testimony, Defendant would have called him to the stand, thereby affording her an opportunity to cross examine him with regard to his records and, apparently, with regard to his medical opinion of Defendant's treatment. Nothing in the record supports such an assumption, nor can a proper determination of prejudice be based on such speculation. Rather, our determination must be based on a comparison of what occurred with what the record discloses would have occurred if the court had granted the relief requested, which was to exclude the deposition altogether. As discussed above, given Plaintiff's evidence and theory of recovery, Dr. Boveri's deposition was immaterial. Had the court excluded his deposition testimony altogether, Plaintiff's case would have been no stronger because her evidence and theory of recovery as espoused by her expert did not depend on her credibility with regard to the disputed additional visits to Defendant. Rather, under the evidence presented, her right to recovery, if any, was based solely on the degree of care exercised by Defendant at the undisputed visits of March 25, 1983 and July 15, 1983, and whether Defendant's negligence, if any, contributed to the problems the child experienced at birth. Under such circumstances, we find that the court's erroneous admission of Dr. Boveri's deposition could not have "materially affect[ed] the merits of the action" as required to support reversal of the judgment under Rule 84.13.

For the foregoing reasons, the judgment in favor of Defendant is affirmed.

CRANE, J., concurs.

CARL R. GAERTNER, P.J., concurs in result in separate opinion filed.

---

2. Although we reject this contention on other grounds, we note that Plaintiff was the party that noticed and took Dr. Boveri's deposition and that her counsel conceded that the purpose of taking the deposition was to establish whether Dr. Boveri had treated Plaintiff. Thus, Plaintiff clearly had the opportunity to examine Dr. Boveri on the subject addressed in the deposition. The record does not disclose what that examination revealed because Plaintiff declined to offer any additional portions of the deposition. Although Plaintiff is correct that such examination, if offered, would not be "in front of the jury," the same would be true if, in the event of a retrial, Defendant made a proper showing of unavailability under Rule 57.07(a)(3), a prospect which cannot be discounted in light of the quantum of proof required to make the required showing. *See McClelland v. Ozenberger*, 805 S.W.2d 264, 269 (Mo.App.1991). As for the alleged lost opportunity to elicit Dr. Boveri's opinion about Defendant's treatment, nothing in the record before us indicates that Dr. Boveri would have any basis for providing such an opinion.

CARL R. GAERTNER, Presiding Judge, concurring in result.

I am reluctant to find that improperly admitted evidence which shows that a party has lied before the jury, even about a collateral matter, is not prejudicial. However, as is clearly set forth in the principal opinion, the testimony of plaintiff's expert was without evidentiary foundation and failed to establish causation. Because plaintiff failed to make a submissible case, I concur in result.