Bobby and Cheryl SOPER and Stanton Dean Soper b/n/f Bobby Soper, Plaintiffs–Appellants,

v.

Ronald J. BOPP, M.D., and Women's Clinic of Joplin, Inc., a Missouri Corporation, Defendants–Respondents.

No. 22313.

Missouri Court of Appeals, Southern District, Division One.

March 17, 1999.

Motion for Rehearing and Transfer to Supreme Court Denied April 8, 1999.

Application to Transfer Denied June 1, 1999.

L. Thomas Elliston, Elliston Law Offices, Webb City, for appellants.

Bruce E. Hunt, Jeffrey S. Monroe, Burkart & Hunt, P.C., Springfield, for respondent.

JOHN E. PARRISH, Judge.

This is an appeal of a defendant's judgment in a medical malpractice case. This court affirms.

Count I is an action for personal injuries brought by Cheryl Soper. She alleges she sustained injuries because of negligent medical treatment she received from Ronald J. Bopp, M.D. (sometimes referred to in this opinion as defendant).[1] Count II is Stanton Dean Soper's action for lost chance of recovery brought by his next friend, Bobby Soper. Count III is a loss of consortium claim and a claim to recover medical expenses for the treatment of Stanton Dean Soper brought by Bobby Soper, husband of Cheryl and father of Stanton.[2]

In April 1993 Cheryl Soper was a patient of Dr. Dan Borello, an obstetrician-gynecologist. She was 27 weeks pregnant. She had been a patient of Dr. Borello since 1988. On Thursday, April 22, she visited Dr. Borello's office complaining of swelling in her ankles, low backache, loss of appetite and a cough. She had a temperature of 100.4 degrees. He examined her for costal vertebral angle tenderness (kidney infection), rupture of the membrane around the baby, respiratory problems, abdominal tenderness indicative of bowel problems such as appendicitis, and uterine tenderness which could be evidence of infection or bleeding behind the placenta. Dr. Borello also examined Cheryl's cervix, which was closed. (A dilated cervix could

1. Women's Clinic of Joplin, Inc., (the clinic) is also a defendant in this action. The parties stipulated, as a matter of law, that if a verdict was returned against Dr. Bopp, the clinic would be vicariously liable. They further stipulated that the jury would not be advised that the clinic was a co-defendant at trial, nor would any instructions be given regarding the clinic's liability in the event verdict was returned against Dr. Bopp.

2. Cheryl Soper, Bobby Soper and Stanton Soper are referred to in this opinion, collectively, as plaintiffs.

provide a source for infection and would be evidence of impending labor.) Dr. Borello prescribed an antibiotic for Cheryl and told her to call the hospital and be seen by a doctor if she was still running a temperature in 48 hours.[3]

On Saturday, April 24, Cheryl went to Freeman Hospital in Joplin, Missouri. She arrived at the emergency room at approximately 2:20 p.m. She was admitted to the hospital some two hours later. Film studies revealed that Cheryl had upper-lobe pneumonia. She was again placed on antibiotics.

Dr. Borello was not on call. Dr. Bopp, a physician who participated in a call coverage arrangement with Dr. Borello, was contacted.[4] He saw Cheryl that evening about 10:30 p.m. He saw her again the next morning about 7:00 a.m. A nurse called him at approximately 11:20 a.m. and told him that Cheryl was complaining of contractions. He ordered application of a fetal monitor. It confirmed the presence of contractions. Dr. Bopp performed a vaginal examination at approximately 12:30 p.m. He ordered administration of the tocolytic drug, Yutopar, between 1:11 p.m. and 1:18 p.m. in an attempt to stop the contractions.[5] At 2:30 p.m., Dr. Bopp performed a second vaginal examination. He diagnosed preterm labor. Cheryl was transferred to Cox Hospital in Springfield where she gave birth to her son, Stanton Soper, April 25, 1993. Stanton suffered complications that required his hospitalization from birth until August 15, 1993, in the hospital's neonatal intensive care unit. A post-delivery pathology report revealed a placental infection.

Plaintiffs' claims against Dr. Bopp are directed to his failure to delay Stanton's delivery. Additional facts relevant to specific points on appeal are included in the discussion of those points.

Point I is directed to Count II, the lost chance of recovery claim. An action for lost chance of recovery was recognized as a cause of action in Missouri in *Wollen v. DePaul Health Center*, 828 S.W.2d 681 (Mo. banc 1992). *Wollen* cites Restatement (Second) of Torts, § 323(a), as the basis for an action for lost chance of recovery. *Id.* at 683. Section 323(a) provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm,....

*Wollen* recognizes lost chance of recovery as a cause of action in the following circumstances:

> Doctors have a treatment that works in a large number of cases and fails in a large number of cases. Because there is a real chance that the patient will survive and a real chance that the patient will die from the disease – even if it is diagnosed – it is impossible for a medical expert to state with "reasonable medical certainty" the effect of the failure to diagnose on a specific patient, other than the fact that the failure to diagnose elim-

3. Dr. Borello testified that if a patient has not responded to antibiotics after 48 hours, further examination and assessment is needed.

4. Dr. Borello explained that because obstetrics and delivery of babies can occur any time day or night, arrangements must be made for delivery of those babies and coverage of patients. The call coverage made sure there was coverage 24 hours a day, 365 days a year.

5. Dr. Edgar Makowski, an expert witness for plaintiffs, was asked, "Now, we've been using the term 'tocolytic' and 'tocolysis.' What is tocolysis?" He explained, "Tocolysis is trying to reduce the irritability of the myometrium. By that, I mean the contractility of the uterine muscle." He explained if the uterus does not contract, the pregnancy will continue.

inated whatever chance the patient would have had.

828 S.W.2d at 682.

*Wollen* explains:

[T]here are compelling reasons for granting compensation in this type of cause of action. The traditional yes-no view of the world in causation theory does not match the "maybe" view of the world found in probability, statistics, and everyday life. To both the statistician and the patient seeking care from a doctor, there is no meaningful difference between a 50.001% and a 49.999% chance of recovery.

Medical science has given patients real chances to recover, sometimes only a small chance, but still a chance, in circumstances that used to be hopeless. When patients go to doctors with serious illnesses, they expect to have those chances that medical science has provided. To the individual patient, if the doctor's negligence destroys the chance of recovery, it is irrelevant what that chance originally was. The courts of this state implicitly recognized this fact as far back as 1923. *Cf. Smith v. Mallinckrodt Chemical Works,* 212 Mo.App. 158, 251 S.W. 155, 158 (1923).

. . .

[T]he patient *does* suffer a harm when the doctor fails to diagnose or adequately treat a serious injury or disease. The harm suffered is not, however, the loss of life or limb. The harm is the loss of the chance of recovery. While, in the end, damages can only be expressed by multiplying the value of a lost life or limb by the chance of recovery lost, the proper place for such an inquiry is in the damages stage rather than in the liability/causation determination. *See Herskovits [v. Group Health Co-op. of Puget Sound],* [99 Wash.2d 609] 664 P.2d [474] at 485–86 [1983] (Pearson, J., concurring); *cf.* William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* 263–69 (1987) (recommending proportional damages in increased risk of death cases involving toxic torts). Therefore, rather than adopting a theory of proportional causation, this Court chooses to recognize a cause of action for lost chance of recovery in medical malpractice cases. [Footnotes omitted.]

*Id.* at 684–85 (emphasis in original).

Count II is based on the allegation that Dr. Bopp "[f]ailed to commence tocolysis at a time it would have continued the pregnancy up to 48 hours." It alleges "[t]hat as a direct and proximate result of the negligence ... Plaintiff Stanton Soper lost a substantial, significant, and material chance of being a term or nearer term baby born without the defects and disabilities from which he presently suffers."

Point I is directed to objections made during defendant's closing argument. It asserts the trial court erred on three occasions when it overruled objections to defendant's attorney's arguments to the jury. The argument was directed to testimony given by Dr. Makowski, plaintiffs' expert witness.

On cross-examination, Dr. Makowski acknowledged that at the time of Stanton's delivery, Cheryl's placenta was infected. He agreed that there are several types of bacteria, or pathogens, that can cause a placental infection. He was asked if there were certain pathogens that could infect the placenta that would cause premature delivery regardless of any tocolysis used. He answered that this was true. Dr. Makowski acknowledged that the identity of the bacteria that caused Cheryl's placental infection was unknown. He was then asked the following questions and gave the following answers:

Q. Whether or not Cheryl Soper would have fit in the category of those patients we've been talking about where the tocolytic agent was effective and the pregnancy was extended 24 hours or more, or whether she would have fit in the other category where it would not have mattered with the early monitoring

and tocolysis, as to which category she falls in, we do not know; do we?

A. No.

Q. Under those circumstances, if Cheryl—if her infection—her placental infection was caused by one of these bacteria and it doesn't matter if tocolysis is given to them or not, her delivery is not going to be delayed, then if she's in that category she has zero chance of tocolysis working; doesn't she?

A. Yes.

Q. Now, if she's in the other category—And I understand you don't know which category she was in, but if she's in the other category, you are not telling this Court and jury that it's 100 percent certain that tocolysis would work; are you?

A. No. I'm not saying 100 percent.

. . .

Q. But as to which category Cheryl fell into, the zero category or the some chance, you don't know?

A. No, sir.

Defendant's attorney categorized patients, for purposes of his inquiry of Dr. Makowski, as being in category A or category B. Category A patients were those whose conditions were such that tocolysis had no chance of delaying delivery. Category B patients were those who had some chance of delaying delivery if tocolysis was administered. Defendant's attorney later used that classification in his argument to the jury.

Plaintiffs' complaints in Point I are directed to the following parts of defendant's attorney's argument to the jury concerning Dr. Makowski's testimony:

So we established through him that there is Category A, where those people are going to deliver regardless of anything that's done and there is no extension of their delivery time. They're not delayed at all. And then there is Category B. And those people have a chance of having their delivery delayed. And he agreed it's not 100 percent chance. No, it's not guaranteed, but at least those people in Category B have a chance of having their pregnancy delivered—delayed.

And here it comes, ladies and gentlemen. Here it comes. This is why you cannot find for the Plaintiff, even under Dr. Makowski's theory.

I said, "So which category did Cheryl Soper come under, Category A or Category B?"

You remember what he said. "I don't know."

Plaintiffs' attorney objected, "[Defendant's attorney] has just made an incorrect statement of the law in loss of chance, that because [Dr. Makowski] doesn't know, that they have to—they can't hold for the Plaintiff." Plaintiffs' attorney added, "He made a misstatement of the law. I'd object to it and I request the Court to correct it." The trial court overruled the objection.

Defendant's attorney continued:

He [i.e., Dr. Makowski] said, "I don't know." You are going to have to find, to be able to find for the Plaintiff, that what Dr. Bopp did caused damage when we're talking about damages to Stanton. You can't find it under these facts, because their own expert witness has said, "I don't know which category his mother was in."

Plaintiffs' attorney again objected, "Judge, same objection. Misstatement of the law." The trial court overruled the objection.

Later in his argument, defendant's attorney returned to the same subject saying:

Now, under Dr. Makowski's theory, he says, "There is [sic] two types of categories, Category A and Category B; and if she falls under Category A, nothing that could have been done would have helped her, because I've had patients just like that. I've done every-

thing right with them, and they went ahead and delivered anyway without any delay. I've had patients that would fall under Category B. And as to them, we had some delay."

"So which is she, Category A or B?"

"I don't know. I don't know."

That's why you can't find on the issue of causation, the issue of liability.

Plaintiffs' attorney objected that the argument was "an improper statement of the law under loss of chance." The objection was overruled.

 Point I asserts the trial court erred in denying each of plaintiffs' attorney's objections. Plaintiffs argue with respect to the first objection that "it is improper to argue a defense outside the scope of the court's instructions" and, with respect to all three objections, that it is "improper to incorrectly inform the jury of the law" by misstatement in closing argument.

Plaintiffs' assertion that defendant's argument was outside the scope of the court's instructions is premised on the verdict-directing instruction given in Count I, Cheryl Soper's claim for damages for negligent medical treatment. The argument to which the objection was posed, however, was directed to Count II, Stanton Soper's claim for lost chance of recovery, not Count I. The subject of the argument was a finding required by paragraph second of Instruction No. 13, the verdict-directing instruction for Count II. It states:

Your verdict must be for Plaintiff Stanton Soper if you believe:

. . .

Second, Plaintiff Stanton Soper had a material chance of the pregnancy of Plaintiff Cheryl Soper continuing long enough to decrease his risk concerning respiratory distress syndrome, bronchopulmonary dysplasia, intracra-

nial hemorrhage, necrotizing enterocolitis and/or retinopathy of prematurity, . . . .

The argument was not "outside the scope of the court's instructions." Likewise, the argument did not "incorrectly inform the jury of the law." In order to recover on Count II, the claim for lost chance of recovery, there had to have been a chance that the treatment plaintiffs contend Dr. Bopp should have administered would have delayed Stanton's delivery. Dr. Makowski stated he could not determine whether there was any chance Stanton's delivery would have been delayed had Cheryl been administered the treatment he espoused.

There was no medical evidence the treatment would have delayed Stanton's delivery. Defendant's argument that, absent such evidence, the jury could not find for Stanton on Count II was not a misstatement of law.

 A trial court is afforded broad discretion in determining if a particular argument is improper. *Titsworth v. Powell*, 776 S.W.2d 416, 420 (Mo.App.1989). An attorney is afforded wide latitude in closing argument to suggest inferences from the evidence. *Id.* The trial court's determination will be disturbed on appeal only if an abuse of discretion occurs. *Id.* The trial court's rulings during the course of closing argument that are the subject of plaintiffs' complaints were not abuses of discretion. Point I is denied.

 Point II asserts the trial court erred in refusing deposition testimony of Dr. Rigg that plaintiffs tendered during their case in chief. Plaintiffs argue they were entitled to use Dr. Rigg's deposition testimony because he was not present in court when they tendered the deposition testimony and was a resident of a county other than the one where the trial was held. *See* Rule 57.07(a)(3)(E), Missouri Rules of Court (1998).[6] Point II states

---

**6.** Trial of this case was held February 10–20, 1998. Thus, the applicable rules were the 1998 version. This court notes, however, that

Rule 57.07 was amended effective January 1, 1999. As amended, Rule 57.07 permits the use of depositions in court, in appropriate

that "plaintiffs established and the defendant admitted, that Dr. Rigg did not reside in Newton County, Missouri and was not present in court at the time plaintiffs offered the deposition of Dr. Rigg and the matters offered were admissible...."

■ This court notes at the outset of its review of Point II that the transcript portion of the record on appeal does not include all of the trial proceedings.[7] It consists of one volume identified as "Partial Transcript on Appeal" and two volumes identified as "Supplemental Transcript on Appeal." The "Partial Transcript on Appeal" was filed with this court August 5, 1998. The "Supplemental Transcript on Appeal" was filed November 13, 1998. The reference to plaintiffs' attempt to use deposition testimony of Dr. Rigg appears in the "Partial Transcript on Appeal." All that appears with respect to their effort to use Dr. Rigg's deposition testimony is an offer of proof by plaintiffs' attorney. There is no explanation of what transpired before the offer of proof was tendered.[8] The transcript reveals only the following.

Plaintiffs' attorney told the trial court:

All right. Judge, I'd like to make the following offer of proof concerning my offer from the deposition of Dr. Rigg. The deposition was taken on July the 9th, 1997, in his office in St. Louis. The Defendant was represented at that deposition by Mr. Hunt. The doctor was placed under oath, and a deposition which should be with this Court—or maybe it hasn't been filed yet, but the deposition is in existence.

Plaintiffs' attorney tendered, as plaintiffs' offer of proof, excerpts of testimony identified by deposition page and line numbers "from that deposition, in accordance with Rule 57 of the Missouri Rules of—of Civil Procedure."

The trial court inquired if defendant's attorney had "an objection to this offer." Defendant's attorney stated he did; that he was objecting "[f]or all the reasons we've talked about earlier and the Court has already ruled on, on that objection." The trial court then permitted defendant's attorney the opportunity to state those objections in the trial record.

Defendant's attorney told the trial court that Dr. Rigg was an expert witness retained by defendant; that he was going to be present to testify later in the trial. The trial court asked plaintiffs' attorney whether there was any of Dr. Rigg's deposition that could not be elicited from Dr. Rigg on cross-examination when he testified later in the case. Plaintiffs' attorney responded that he suspected so; that regardless there would be a difference because he would be eliciting information on cross-examination rather than in his case in chief. The trial court refused the offer of proof.

■ "[A]lthough the factual determination of whether the requirements of Rule 57.07 are satisfied is a determination largely within the trial court's discretion, strict compliance with the express requirements of the rule *as of the time the deposition is offered* is not a matter of discretion." *Nachtweih v. Maravilla*, 861 S.W.2d 164, 169 (Mo.App.1993)(emphasis

circumstances, "for any purpose if the deponent is not in court...." Rule 57.07(a)(2), Missouri Rules of Court (1999).

7. The state of the record on appeal has made appellate review of this case difficult. The transcript is abbreviated to such an extent that it is difficult to ascertain, with any degree of certainty, what occurred during much of the course of the trial. The legal file is equally difficult to decipher. For example, it includes copies of the trial court's docket entries but the docket sheets on which those

entries appear are in reverse chronological order contrary to requirements of Rule 81.12(a). *See Watson v. Moore*, 983 S.W.2d 208, 209 (Mo.App.1999).

8. The purpose of an offer of proof is to insure that the trial court has a clear understanding of the evidence it is called to rule upon and that the appellate court has a specific record to review. *Hawkinson Tread Tire Service Co. v. Walker*, 715 S.W.2d 335, 336 (Mo.App. 1986).

in original). "The competency of a deposition is to be determined by the status of the witness at the time the deposition is offered in evidence." *Maplewood Planing Mill & Stair Co. v. Pennant Const. Co.*, 344 S.W.2d 629, 633 (Mo.App.1961).

 It was error not to allow plaintiffs to present the deposition testimony of Dr. Rigg. *Bowls v. Scarborough*, 950 S.W.2d 691, 701 n. 6 (Mo.App.1997); *United Services of America v. Empire Bank*, 726 S.W.2d 439, 445 (Mo.App.1987). However, error in refusing to admit deposition testimony is not, *per se*, prejudicial error. *Cook by Cook v. Willis*, 885 S.W.2d 791, 795 (Mo.App.1994).

 Plaintiffs argue, however, that their case was prejudiced by the trial court's refusal to permit them to introduce part of Dr. Rigg's deposition testimony because "it would greatly reinforce Plaintiffs' expert and establish that Defendant Bopp was negligent, 'that he failed to recognize that Plaintiff Cheryl Soper was a high risk for preterm labor' and 'that he failed to properly administer the drug Yutopar to Plaintiff Cheryl Soper.'" Plaintiffs assert the value of this testimony was that the jury would find testimony helpful to plaintiffs' case persuasive when it came "from an expert witness that the defendant [was] paying thousands of dollars."[9]

The issues plaintiffs stated they wanted to place before the jury by Dr. Rigg's deposition testimony were covered in their cross-examination. Plaintiffs' attorney asked Dr. Rigg if, in his deposition, he told the attorney "that Cheryl was a high risk for preterm labor before she ever got to the hospital"? Dr. Rigg answered, "Yes." Dr. Rigg was also asked if he recalled

being asked at his deposition if other members of his profession, or Dr. Bopp's profession, would have evaluated or considered her at high risk for preterm labor at the time of her hospitalization and if he answered, "They probably considered her—and I am sure Dr. Bopp did as well, considered her at high risk for preterm labor." He answered, "You're reading from the depo. It must be correct."

Plaintiffs' attorney also asked Dr. Rigg the following questions and Dr. Rigg gave the following answers:

Q. . . . So you recall at the deposition—Well, let me ask it this way. Are you aware of any literature that says Yutopar should be given in this manner that Dr. Bopp gave it?

A. No, I am not.

Q. Are you aware of any human being that has ever gotten that dosage of Yutopar?

A. No, I am not.

Q. Is that the way the manufacturer recommends it to be given?

A. The Physicians' Desk Reference does not describe that method.

. . .

Q. Now, getting back to the way you administer the Yutopar, would the other members of Dr. Bopp's profession, using that degree of skill and learning ordinarily used under the same or similar circumstances, have given this lady the Yutopar in the manner Dr. Bopp did?

A. I would say probably they would not. I don't know what's going on in Freeman Hospital, if that's the standard there. But across the country, people

9. Plaintiffs rely on *Helm v. Wismar*, 820 S.W.2d 495, 497 (Mo. banc 1991), in which the court stated an attorney has no right to rely, and should not rely, on statements by an opposing counsel that an expert witness "will testify." Plaintiffs suggest *Helm* "is directly in point." In *Helm* an attorney did not present deposition testimony of the opposing party's expert witness based on a representation that the expert would testify later in the trial.

The expert did not testify. It was this scenario that produced the language that counsel has no right to rely on statements by opposing counsel that an expert witness "will testify." This court does not find that the issue determined in *Helm* is determinative of the issue in plaintiffs' Point II. In this case Dr. Rigg testified as represented by defendants' counsel. He was cross-examined by plaintiffs' attorney in considerable detail.

would follow the Physicians' Desk Reference and start with the low dose and build.

Q. Doctor, at the deposition you knew what was going on at Freeman Hospital because you told me he violated their protocols, too, didn't you?

A. Well, that's what I—what I read from the nursing protocol, yes.

The issues plaintiffs complain they were prevented from presenting to the jury were addressed in detail in the cross-examination. Under these circumstances, this court finds no prejudice to plaintiffs by the trial court's refusal to let them read from Dr. Rigg's deposition during plaintiffs' case in chief. Point II is denied.

■■■ Point III is directed to the trial court's refusal to admit plaintiffs' Exhibit No. 4 in evidence. Defendant objected that there was no foundation for the exhibit. The trial court sustained the objection. Plaintiffs assert this was error; that "Exhibit 4 was a properly authenticated business record that was admissible in evidence in that it included the affidavit required by section 490.692, RSMo.1994[,] which gives the exhibit a foundation." Plaintiffs further assert, as a basis for their claim of error, that "no specific objection was made to any portion of the exhibit" and that "the exhibit contained evidence that was admissible to prove the history, diagnosis and treatment of Cheryl by mental health care professionals."

Plaintiffs' Exhibit No. 4 is records of an organization identified on an accompanying affidavit, in the form prescribed by § 490.692.3,[10] as "Family Life Center." Defendant's attorney objected that no foundation had been laid; that the statute on which plaintiffs were relying, § 490.692, permits an exhibit to be admitted without requiring a records custodian to testify; that it does not preclude the requirement that a foundation as to materiality and

relevancy be established. Plaintiffs' attorney advised the trial court that the exhibit dealt with the Family Life Center where Cheryl Soper was employed and also received counseling "[i]n '93, '94 and '95." Defendant's attorney was asked again what was his objection. He answered that the exhibit was not a self-proving document; that there was no foundation that any findings in the exhibit were material to any claim made against defendant by any of the plaintiffs. The trial court sustained defendant's objection to the exhibit.

Section 490.692.1 states:

Any records or copies of records reproduced in the ordinary course of business by any photographic, photostatic, microfilm, micro-card, miniature photographic, optical disk imaging, or other process which accurately reproduces or forms a durable medium for so reproducing the original that would be admissible under sections 490.660 to 490.690 shall be admissible as a business record, *subject to other substantive or procedural objections*, in any court in this state upon the affidavit of the person who would otherwise provide the prerequisites of sections 490.660 to 490.690, that the records attached to the affidavit were kept as required by section 490.680.[[11]] (Emphasis added.)

■■ Cheryl Soper's claim for personal injuries is set forth in Count I, her cause of action for negligent medical treatment. Count I alleges, *inter alia*, "[t]hat as a direct and proximate result of the negligence ..., Plaintiff Cheryl Soper has suffered ... emotional and mental damage...."

■■■ The requirements for recovery of damages for emotional distress are stated in *Pendergist v. Pendergrass*, 961 S.W.2d 919 (Mo.App.1998):

To recover damages for emotional distress, a plaintiff must show that (1) the

---

**10.** References to statutes are to RSMo 1994.

**11.** §§ 490.660—.690 are "The Uniform Business Records as Evidence Law." *See* § 490.660.

defendant should have realized that his conduct involved an unreasonable risk of causing the distress and (2) the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant. *Bass v. Nooney Co.*, 646 S.W.2d 765, 772 (Mo. banc 1983).

*Id.* at 923. The requirement that the emotional distress or mental injury be "medically diagnosable and . . . of sufficient severity so as to be medically significant" is the causation element that must be shown in order to recover.

■■■■■ A causal connection between an event and an injury may be inferred in cases in which a visible injury or a sudden onset of an injury occurs. *Williams v. Jacobs*, 972 S.W.2d 334, 340 (Mo.App. 1998).[12] "However, when the injury is a 'sophisticated injury, which requires surgical intervention or other highly scientific technique for diagnosis, . . . the proof of causation is not within the realm of lay understanding.'" *Id.* quoting from *Griggs v. A.B. Chance Co.*, 503 S.W.2d 697, 704 (Mo.App.1973). The requirement that an emotional distress "must be medically diagnosable and must be of sufficient severity so as to be medically significant" makes it a "sophisticated injury" for purposes of establishing causation.

The record before this court does not include expert testimony that established Cheryl Soper's emotional distress was caused by Dr. Bopp's actions. Section 490.692.1 does not exempt plaintiffs' Exhibit No. 4 from that requirement. Point III is denied.

■■■ Point IV contends the trial court erred in refusing a withdrawal instruction, Instruction No. A, tendered by plaintiffs.[13] Instruction No. A states:

The evidence as to what Parkland Hospital in Dallas, Texas does or does not do is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.

Instruction No. A was directed to testimony given by Dr. Makowski, plaintiffs' expert witness, during cross-examination. Dr. Makowski advocated use of glucocorticoid steroids to patients similar to Cheryl Soper. That treatment had not been administered to her. Dr. Makowski was questioned about statements in medical writings that were not consistent with his opinion with respect to whether the treatment was appropriate. He was asked to read from one of those writings. The material he read included the sentence, "For all of these reasons, and especially because of their questionable benefits, at Parkland Hospital glucocorticoids have not been employed in women remote from term to try to reduce the risk of respiratory distress." He was asked about the location of Parkland Hospital and the type of facility it was. He testified it was located in Dallas, Texas; that it was a major center. Plaintiffs did not object to the testimony.

■■■■ "[O]bjection to evidence cannot be made for the first time by offering a withdrawal instruction." *Colley v. Tipton*, 657 S.W.2d 268, 272 (Mo.App.1983). Furthermore, "[t]he giving of a withdrawal instruction rests within the sound discretion of the trial court and absent an abuse of such discretion, refusal to give a with-

---

12. "A visible injury is one in which there is evidence of an obvious wound, such as a cut, bruise, or immediate bleeding." *Williams v. Jacobs*, 972 S.W.2d at 340. "Under the sudden onset doctrine, a causal connection may be inferred if the injury 'develops coincidentally with the negligent act, such as broken bones . . ., immediate, continuing back pain . . ., or an obvious wound. . . .' *DeMoulin v. Kissir*, 446 S.W.2d 162, 165 (Mo.App.1969). The testimony of a lay witness is sufficient to

establish the nature, cause and extent of an injury 'when the facts fall within the realm of lay understanding.' *Griggs v. A.B. Chance Company*, 503 S.W.2d 697, 704 (Mo.App. 1973)." *Id.*

13. *Stevens v. Craft*, 956 S.W.2d 351, 355, *et seq.*, (Mo.App.1997) discusses circumstances in which the giving of withdrawal instructions are proper.

drawal instruction constitutes no basis for complaint." *Parker v. Pine*, 617 S.W.2d 536, 542 (Mo.App.1981). "Ordinarily, it is not error to refuse a withdrawal instruction." *Id.* The trial court did not abuse its discretion in sustaining defendant's objection to Instruction No. A. Point IV is denied. The judgment is affirmed.

PREWITT, P.J., and CROW, J., concur.