**Charles FOSTER and Ginger Foster, Plaintiffs–Respondents,**

v.

**CATALINA INDUSTRIES, INC., Defendant Appellant.**

and

**Grandrich Corporation, Defendant– Respondent.**

No. 23760.

Missouri Court of Appeals, Southern District, Division II.

Aug. 7, 2001.

Petition for Rehearing and Transfer Denied Aug. 29, 2001.

Application for Transfer Denied Oct. 23, 2001.

Richard Davis and Tamara F. de Wild, Whiteaker & Wilson, P.C., Springfield, MO, Thomas A. Sheehan, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, for Defendant/Appellant Catalina Industries, Inc.

Clifton M. Smart III, Neil Chanter and James A. Burt, The Strong Law Firm, P.C., Springfield, MO, for Plaintiffs/Respondents Charles Foster and Ginger Foster.

David Phillip Madden, Overland Park, KS, for Defendant Grandrich Corporation.

PREWITT, Judge.

Plaintiffs sought damages for the wrongful death of their son, Conor Foster. He was electrocuted and died on November 10, 1995, when he touched a floor lamp at his home. Aside from damages, the only issue presented in the jury trial was which of the Defendants imported the lamp which the parties agree was defective. The jury returned a verdict against Defendant–Appellant Catalina Industries, Inc. ("Catalina"), finding Plaintiffs' damages to be $15 million. Judgment was entered in accordance with the verdict with the addition of prejudgment interest. Defendant Catalina appeals, presenting eight points relied on. They are discussed in the order stated in Appellant's brief.[1]

1. As there are two separate sets of respon-    dents, we refer to Catalina Industries, Inc. as

### Facts

Ginger and Charles Foster purchased a black, halogen, swing-arm lamp from Best Products in Missoula, Montana on November 11, 1991. Charles Foster returned the floor lamp to Best Products in October of 1992 because the light flickered and the dimmer switch hummed. A store employee informed Foster that they did not have a replacement lamp in stock at that time and gave him a voucher to redeem after the store received a new shipment of the lamps. On November 14, 1992, the Fosters redeemed their voucher and were given a new, black, halogen, swing-arm lamp appearing to be like the one they originally purchased.

On November 10, 1995, the Fosters' four-year-old son, Conor, was electrocuted while playing hide-and-seek with his brother in the Fosters' living room. At the time of his death, the source of the electrocution could not be determined. Approximately two years later Charles Foster received an electrical shock from the lamp as he reached to retrieve an item he had dropped and made contact with the base of the lamp and a metal air duct cover. He then realized that Conor may have been electrocuted from touching the lamp.

Initial testing of the lamp revealed that the lamp frame was energized at all times when plugged into an outlet. The cause of the defect, a cut in the insulation of the electrical wiring and a reversal of the positive and neutral wiring at a splice on the wire, was discovered on August 7, 1998, when the lamp was disassembled in Norman, Oklahoma. This defect caused the lamp to remain "hot," thereby energizing the frame at all times when the lamp was plugged into an outlet. As a result, an electric current would pass through any

person touching both the lamp frame and a well-grounded object.

The Fosters filed a suit for damages for wrongful death against Grandrich Corporation and Catalina Industries, Inc. Although both defendants stipulated that the defective lamp was the cause of Conor Foster's death, each deny that they imported the subject lamp. Grandrich Corporation ("Grandrich") was the exclusive supplier of black, halogen, swing-arm lamps to Best Products, Inc. in 1991 and early 1992. Best Products received its last shipment of the lamps from Grandrich on January 22, 1992. Dana Lighting ("Dana"), a subsidiary of Catalina Lighting, Inc. (now Catalina Industries), became the exclusive supplier of such lamps in 1992. Best Products received its first shipment of lamps from Dana in April, 1992. Between April, 1992, and January, 1993, Best Products received a total of 2,868 lamps from Dana, 54 of which were received on October 29, 1992. Best Products' 1991–1992 catalog did not designate the manufacturer of the black swing-arm halogen lamps it offered, but its 1992–1993 catalog said that the lamp was "by Dana."

A salesperson who had worked for both Grandrich and Dana testified that Best Products' merchandising policy when one vendor replaced a previous vendor's product line was to sell the former vendor's stock first, before offering the new vendor's product for sale. He estimated that Grandrich's last shipment of swing-arm halogen lamps to Best Products in January, 1992 would have been sold by May, 1992, based on the high turnover rate for that model of lamps.

Identifying the importer of the lamp, Grandrich or Catalina, was complicated

either "Appellant" or "Catalina," and Plaintiffs Charles Foster and Ginger Foster as

"Plaintiffs."

further because of the two Underwriters Laboratories ("UL") identifying stickers found on the lamp. One sticker bored the number E135362, a number UL assigned to Jackson Industries. The other sticker bore the number BD37740, a number UL assigned to Royal Lighting.

Grandrich contended that it imported the 9,098 lamps it sold to Best Products from July, 1991 to January, 1992 from only two sources, Nicesun and Jackson Liting. Grandrich provided documentation that the 7,094 lamps it imported from Nicesun bore the UL number E124037, and the remaining 2,004 lamps it obtained from Jackson Liting through Luckytown, a trading company, bore the UL number E127367.

Dana asserted that it imported some of its lamps through Liform, and that those lamps bore the UL number E127329. Dana also purchased lamps from Brightech, a manufacturer of lamps and a trading company which acts as an intermediary in selling products manufactured by others, but could not provide UL documentation for those lamps. Although Dana does not know who manufactured all of the lamps it purchased from Brightech, it claims that the subject lamp could not have been a Dana lamp because the subject lamp used different fastenings than those used on Dana lamps.

Dana denied that it did business with Jackson Liting or Royal Lighting, but Jackson Chen, president of Jackson Liting, admitted in a signed affidavit that Jackson Liting manufactured lamps like the subject lamp for Dana Lighting for sale in the United States. Chen later retracted that affidavit and executed a new one denying manufacture of lamps like the subject lamp for Dana in a meeting with the president of Dana, David Hauser, and Dana's attorney, Richard Davis. There was some indication that Chen might not have understood the significance of the original affidavit when he signed it due to miscommunication or translation difficulties.

Chen testified in a deposition that Royal Lighting was an authorized factory for Jackson Liting and had manufactured lamps under the Jackson Liting UL number. He also testified that he had been acquainted with Hauser for about fifteen years and had sought permission to use Dana's UL numbers in 1990. Chen suggested that Jackson Liting's agency with Royal Lighting ended in 1992 because Royal put the wrong UL number on lamps it manufactured. There was also evidence that Liting Universal, who manufactured lamps under a Dana UL number, had been reprimanded by UL because it used a different model "hi-pot tester" (to determine polarity) than specified by UL, had not had the hi-pot tester calibrated in over a year, and could not account for all its UL labels. UL instructed Liting Universal to have the hi-pot tester calibrated within 21 days and to not keep more than 2,000 UL labels in its facility at a time.

At the conclusion of the evidence, plaintiffs' attorney asked the jury for $10 million in damages. Counsel for Grandrich told the jury that $10 million may not be enough. Counsel for Catalina told the jury to do what it felt was reasonable.

The jury found in favor of Grandrich, held Catalina Industries, Inc. liable, and assessed $15 million in damages. Judgment was entered against Catalina for $17,282,054.71 after adding prejudgment interest. Catalina requested remittitur, a new trial, and judgment notwithstanding the verdict, each of which the court denied. Catalina filed its notice of appeal on July 14, 2000.

## Discussion

For its first point, Appellant contends that the trial court erred in not granting

its motion for directed verdict "because plaintiffs did not make a submissible case on the issue of product identification in that plaintiffs' evidence that Catalina was the importer disproved their evidence that [Defendant] Grandrich [Corporation] was the importer and *vice versa.*" We see the second point and the argument under it as related to this issue, and we consider the points together. Point II states: "The Circuit Court erred in denying Catalina's motion to designate a defendant because plaintiffs' claims against Catalina and Grandrich were mutually repugnant in that plaintiffs' evidence that Grandrich was the importer disproved their evidence that Catalina was the importer and *vice versa.*" [2]

■ Appellant asserts that "[t]his case presents the question whether a plaintiff in a product liability case may sue two defendants, only one of whom may be liable, present evidence showing that either defendant is liable, and then simply let the jury decide who is liable." Appellant argues that "[b]y electing to submit their case against both Catalina and Grandrich, plaintiffs guaranteed that they could not make a submissible case against either."

There is no real dispute that the evidence was sufficient for the jury to find that Appellant was the importer, unless Plaintiffs' evidence against Grandrich nullified it. The question also remains if it was proper for Plaintiff to proceed as it did, that is, suing two defendants as possible importers, presenting evidence against both and essentially in favor of both, and letting the jury decide which one is responsible.

Appellant relies primarily upon *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo.banc 1984) under its first two points. As Appel-

lant states, that case rejected theories of alternative liability, concert of action, industry-wide liability and market-share liability, and concluded that a plaintiff has to identify the defendant responsible for the defective product. In arguing that *Zafft* applies here, Appellant states that the only causal relationship shown "was evidence that equally justified holding Catalina liable and exonerating Grandrich as it did holding Grandrich liable and exonerating Catalina." They thus contend that the evidence Plaintiffs offered on the issue of who imported the lamp was equal. We do not agree, as the evidence preponderated in favor of establishing that Catalina imported the lamp.

First, although there was evidence that both Grandrich and Catalina imported lamps manufactured by Jackson Liting, Grandrich was able to provide UL documentation for all of the lamps it imported, exonerating itself, and Catalina (Dana) could not. Second, when Plaintiffs returned the halogen lamp with the defective dimmer switch to Best Products for a replacement in October, 1992, they had to wait until a new shipment of lamps arrived. Best Products received a shipment of 54 such lamps from Dana, the exclusive supplier of those lamps to Best Products at that time, on October 29, 1992. Thus, the most compelling interpretation of the facts is that Dana imported the defective lamp, not Grandrich.

In response, Plaintiffs primarily rely on *Cook v. Holcomb*, 854 S.W.2d 78 (Mo.App. 1993). *Cook* involved a collision between two vehicles. Plaintiff truck driver sued the occupants of the automobile, a father and son, for damages. There was conflicting evidence as to who was operating defendants' vehicle. Plaintiff submitted and the court gave an instruction asserting

---

**2.** Plaintiffs say there is no basis for such a motion. Whether that is correct we do not decide, as even if procedurally correct the trial court properly denied the motion.

negligence by the father in operating the automobile; negligence by the son in operating the automobile; and negligence by the father in entrusting the automobile to his son. The jury found that the father negligently operated the vehicle.

On appeal, defendant father claimed that the trial court erred in allowing the jury to consider contradictory theories of negligence against both defendants. *Cook* states that: "where there is independent and conflicting evidence to support either of two factual scenarios which would make a submissible case or defense but could not both be true, the cases have routinely approved submission of both theories *in the disjunctive*." *Id.* at 81. *Cook* concluded that cases recognize that "the resolution of such factual conflicts is part and parcel of the jury's function. Thus we find no error in the trial court's refusal to require Plaintiff to elect which factual scenario would be submitted to the jury." *Id.* at 82.

*Cook* and the cases it relied on and discussed state the correct rule applicable here. *Zafft* was decided not on who was at fault but on the absence of proof of any specific person or entity being at fault, and thus is not applicable. Plaintiffs were entitled to have the jury decide liability. Points I and II are denied.

■ For its third point, Appellant contends that the trial court erred in denying its motion for remittitur because the $15 million actual damages was so excessive that it shocked the conscience, as there was no evidence of an economic loss and the verdict is disproportionate to verdicts and settlements in similar wrongful-death cases, and because the verdict was the result of trial court error in admitting evidence and argument that prejudiced the jury against Catalina.

Before discussing this point, we notice that the record indicates no real effort to litigate the damages. Each defendant was content to argue liability and not dispute the damages. In its opening statement, Catalina told the jury that it was undisputed that Plaintiffs had suffered a "tremendous" loss. Neither Catalina nor Grandrich asked Plaintiffs' damage witness any questions on cross-examination. In Plaintiffs' initial closing argument, Plaintiffs' counsel suggested that the jury award $10 million in damages. Catalina did not refute the amount Plaintiffs suggested or suggest a different figure; it told the jury to do what it felt was reasonable. Counsel for Grandrich advised the jury that Plaintiffs may not have requested enough.

Plaintiffs argue that Catalina conceded the issue of damages by failing to cross-examine Plaintiffs' damage witnesses and by failing to counter Plaintiffs' suggested damages award in closing argument, and that therefore we should treat the issue as admitted. The cases that Plaintiffs cite to support this argument, *Woods v. Moffitt*, 225 Mo.App. 801, 38 S.W.2d 525, 529 (1931), *Hampe v. Versen*, 224 Mo.App. 1144, 32 S.W.2d 793, 796 (1930), and *Voelpel v. Wuensche*, 74 S.W.2d 14, 16 (Mo. 1934), are distinguishable from the present case in that in *Woods* and *Hampe*, the defendants essentially conceded liability, and in *Voelpel*, although the defendant conceded damages, it was on payment of a bill, the accuracy of which was not disputed.

In the present case, neither defendant conceded liability. Furthermore, as Plaintiffs note in their brief, the calculation of damages in any wrongful death case inherently involves some element of speculation and intangibles. *See Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir. 1988). To say that by telling the jury to award what they felt was reasonable, defendant Catalina was admitting that $10 million was a fair amount seems a bit far-

fetched. However, without any evidence at trial that Plaintiffs overstated their damages or the extent of their loss, or that Plaintiffs could be appropriately compensated for their loss with a lesser sum, we are without basis to remit the jury's award.

■ Generally, the issue of damages is left to the discretion of the jury. *Emery v. Wal–Mart Stores, Inc.,* 976 S.W.2d 439, 448 (Mo.banc 1998). A trial court is not to interfere with the jury's determination of damages unless it is convinced that the verdict exceeds fair and reasonable compensation for the plaintiff's injuries and damages. *Fust v. Francois,* 913 S.W.2d 38, 49 (Mo.App.1995). We defer to the jury's and the trial judge's determination of damages because they are in much better positions than the appellate court to assess the credibility of damage witnesses and to determine the appropriate compensation. *Emery,* 976 S.W.2d at 448. Thus, we will interfere with the jury's verdict only when it so excessive that the conscience of the court is shocked and we are convinced that both the jury and trial court abused their discretion. *Id.*

The award here, while high, does not shock the conscience of this court or convince us that the jury and the trial court abused their discretion. Appellant's third point is denied.

■ For its fourth point, Appellant states that the court erred in including prejudgment interest, as there was no evidence to support it in that Plaintiffs sought such interest by merely attaching a demand letter to their response to Catalina's motion for remittitur. Plaintiffs acknowledge that there was no hearing and apparently no evidence supporting an award of prejudgment interest, but citing *Brown v. Donham,* 900 S.W.2d 630, 632 (Mo.banc 1995), they assert that an after-trial evidentiary hearing is unnecessary if the

court is otherwise fully advised and there is no genuine issue of material fact.

The record does not establish that there was no genuine issue of material fact. The fourth point has merit. The portion of the judgment awarding prejudgment interest is reversed. As there was no evidence supporting that award and no attempt to prove entitlement to it, the cause is remanded to the trial court to reduce the judgment by the amount awarded as prejudgment interest.

■ In its fifth point, Appellant asserts that the court erred in admitting various exhibits showing that David Hauser acted as the Underwriters Laboratories' ("UL") representative for Jackson Industries and certain documents in Dana Lighting's (predecessor of Catalina) UL file having Jackson Industries' E number on them. An "E number" is assigned by UL to listees, those UL applicants whose products have been tested to meet safety standards set by UL, who produce portable electric lamps. Either the manufacturer's name, the UL number, or some other means of identification must appear on the lamp.

■ Evidence is relevant when the material offered tends to prove or disprove a fact or corroborates other evidence. *Yaeger v. Olympic Marine Co.,* 983 S.W.2d 173, 186 (Mo.App.1998). Admissibility of evidence is within the sound discretion of the trial court. *Misischia v. St. John's Mercy Med. Ctr.,* 30 S.W.3d 848, 865 (Mo. App.2000).

Here, the evidence against Defendants was circumstantial, as there was no direct evidence that either Catalina or Grandrich imported the lamp. The disputed exhibits indicate a relationship between the probable manufacturer of the lamp and Catalina and thus supported the theory that Appellant imported the lamp. Under these cir-

cumstances, we find no abuse of discretion. Point V is denied.

For its sixth point, Appellant contends that the trial court erred in admitting an affidavit of Jackson Chen and its translation because the affidavit does not state that he has personal knowledge of the facts and the parties did not stipulate to its admissibility. Appellant also contends that the trial court erred in admitting Richard Yu's testimony regarding his conversation with Jackson Chen and a partial translation of that conversation, "because the evidence was inadmissible hearsay in that it did not satisfy the exception for admissions against interest."

It is not necessary to determine whether these exhibits and testimony were admissible as a hearsay exception for admissions against interest because we conclude that the trial court could have determined that such were prior inconsistent statements inconsistent with Jackson Chen's deposition testimony. Such statements are not only admissible for impeachment but are substantive evidence in a civil trial. *See Rowe v. Farmers Ins. Co., Inc.,* 699 S.W.2d 423, 428 (Mo.banc 1985). The form of a prior inconsistent statement does not matter. *Id.* at 425–28; *see also Phillips v. American Motorist Ins. Co.,* 996 S.W.2d 584, 593 (Mo.App.1999); *Kilventon v. United Missouri Bank,* 865 S.W.2d 741, 744 (Mo.App.1993); *Mercantile Bank and Trust Co. v. Vilkins,* 712 S.W.2d 1, 4 (Mo. App.1986). Point VI is denied.

For its seventh point, Appellant contends that the trial court erred in allowing Grandrich's attorney to cross examine Dorothy Elliot regarding purchases from and letters of credit issued to Liting Universal and in admitting exhibits 610 and 612 and cross examination of Dennis Caya regarding the same. Plaintiffs assert that Grandrich's counsel did not cross-examine Mrs. Elliot about Liting Universal. Our review of the portion of the transcript in which Grandrich's attorney, David Madden, cross-examined Elliot confirm that he did not ask her any questions concerning Liting Universal. Madden's cross-examination was limited to questions regarding Jackson Industries, Liform, Pou Hung, and Best Products. The first part of Appellant's point is without merit and is thus denied.

As to the second half of this point, Plaintiffs contend that it was not properly preserved for appellate review, as there was no objection at the time the evidence was introduced. That is, of course, the standard rule, that an objection must be made at the time the evidence is sought to be introduced. *State v. Reynolds,* 782 S.W.2d 793, 797 (Mo.App.1989). Madden asked Caya twenty some questions about a March 29, 1992 UL investigative report concerning Lighting Universal without objection, until Madden asked Caya "how" the UL inspector's report of missing UL labels "fit into" Caya's "theory about what Royal did with these labels." Catalina then objected, arguing that the evidence was "not relevant to what happened with this lamp." Catalina also objected on relevancy grounds when Madden offered exhibits 610 and 612, which corresponded to the testimony, into evidence. If Catalina had an objection to Caya testifying regarding Lighting Universal and the missing UL labels, as it claims to have on appeal, it should have made that objection when the topic was introduced. Appellant's seventh point is denied.

For its eighth and final point, Appellant contends that the trial court erred in refusing a withdrawal instruction it submitted which stated that "the issue of whether the subject lamp was acquired by Dana Lighting through Brightech is withdrawn from the case and you are not to

consider such issue in arriving at your verdict." Plaintiffs argue that Appellant did not object when any of the evidence sought to be withdrawn was introduced. Our review of the record confirms this.

Giving a withdrawal instruction is left to the sound discretion of the trial court. *Miles v. Dennis,* 853 S.W.2d 406, 409 (Mo. App.1993). Failure to give a withdrawal instruction is reversible error only when the evidence sought to be withdrawn creates a false issue. A withdrawal instruction should not be given if the court did not receive any objection to the evidence when it was introduced, as an objection to evidence cannot be made for the first time by offering a withdrawal instruction. *See Soper v. Bopp,* 990 S.W.2d 147, 157 (Mo. App.1999).

Thus, Appellant's contention is without merit. Even if the evidence sought to be withdrawn was irrelevant, which we do not believe it was, the court acted properly in refusing to submit the proposed withdrawal instruction as Appellant did not object to the introduction of such evidence. Appellant's eighth point is denied.

The judgment is affirmed except as to the issue presented in Appellant's fourth point, upon which we reverse and remand to the trial court to reduce the judgment by eliminating the prejudgment interest.

BARNEY, C.J., concurs; GARRISON, J., dissents in separate opinion.

GARRISON, Judge, dissenting.

I concur with the principal opinion except that portion concluding that the trial court's denial of Catalina's Motion For Remittitur should be affirmed. I respectfully dissent with regard to that portion of the opinion.

I agree with the general principles reviewed in the principal opinion concerning interference with a jury's determination of damages. Thus, in a wrongful death case, the jury has extraordinarily wide discretion in awarding damages, and the trial court has great discretion in approving a verdict or setting it aside as excessive. *Letz v. Turbomeca Engine Corp.,* 975 S.W.2d 155, 174 (Mo.App. W.D.1997). An appellate court will interfere only when the verdict is so grossly excessive that it shocks the conscience of the court and convinces the court that both the jury and the trial court abused their discretion. *Id.*

There are generally two situations in which the issue of excessiveness of the verdict arises: (1) where the verdict is simply disproportionate to the proof of injury and results from an honest mistake by the jury in assessment of the evidence, and (2) where the verdict's excessiveness is engendered by trial misconduct and thus results from the bias and prejudice of the jury. *Barnett v. La Societe Anonyme Turbomeca,* 963 S.W.2d 639, 655 (Mo.App. W.D.1997). A verdict under the first scenario may be corrected by an enforced remittitur and does not require a retrial, while a verdict of the second variety is prejudiced and can only be remedied with a new trial. *Id.* Here, Catalina disputes the denial of its Motion For Remittitur which was founded on the allegations that: (1) There was no evidence of economic loss presented; (2) there was no evidence of medical or funeral bills presented; (3) the issue of aggravating circumstances was not submitted to the jury; (4) the jury was specifically instructed not to consider Plaintiff's grief and bereavement; (5) the verdict does not comport with the damages evidence; and (6) the verdict does not comport with verdicts and settlements in other wrongful death cases in Missouri over the course of the last fifteen (15) years. Catalina now argues that not only was the verdict excessive, but it was also the result of trial court error in erroneous-

ly admitting evidence, and by an argument that prejudiced the jury against it.[3] That theory, however, is foreign to the motion for remittitur at issue here.

The doctrine of remittitur is intended to produce equitable compensation and to eliminate the retrial of lawsuits. *Fust v. Francois*, 913 S.W.2d 38, 49 (Mo.App. E.D. 1995). Remittitur is appropriate if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation. Section 537.068, RSMo 2000; *Fust*, 913 S.W.2d at 49. Said another way, "[w]here the jury errs by awarding a verdict that is simply too bountiful under the evidence, injustice may be prevented by ordering a remittitur." *Letz*, 975 S.W.2d at 175. There is, however, no exact formula to determine whether a verdict is excessive, and each case must be considered on its own merits. *Barnett*, 963 S.W.2d at 657.

Damages in a wrongful death case are governed by § 537.090, RSMo 2000, which provides that in every such action:

> [T]he trier of the facts may give to the party or parties entitled thereto such damages as the trier of the facts may deem fair and just for the death and loss thus occasioned, having regard to the pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death and without limiting such damages to those which would be sustained prior to attaining the age of majority by the deceased or by the person suffering any such loss. In addition, the trier of the facts may award such damages as the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained an action had death not ensued. The mitigating or aggravating circumstances attending the death may be considered by the trier of the facts, but damages for grief and bereavement by reason of the death shall not be recoverable.

Accordingly, compensatory damages may be awarded based on the pecuniary losses suffered by reason of the decedent's death, funeral expenses, loss of services, consortium, companionship and comfort, and the pain and suffering experienced by the decedent prior to his death. *Letz*, 975

---

**3.** One of Catalina's arguments under this point is that Grandrich's counsel invoked the sympathy of the jury and invited the jury to award damages for grief and bereavement when he told of the loss of his own son and argued that the figure requested by plaintiff's counsel—$10 million—was not enough. Although not referred to in Catalina's brief, it is noted that this argument was followed by Plaintiffs' final portion of their closing argument in which their attorney argued to the jury that "if it were me and I had to make the decision, I would fill in on that first line Fosters for certain. And I would fill in on the second line Grandrich, because you can't find against both." This referred to the procedure, followed by the jury, of finding for Plaintiffs against Catalina, but for Grandrich on Plaintiffs' claim. Catalina's argument concerning the comments by Grandrich's counsel indicates a claim of trial misconduct with resulting bias and prejudice by the jury. An excessive verdict resulting from jury bias and prejudice requires a showing of trial court error or misconduct of the prevailing party. *Letz*, 975 S.W.2d at 175; *Barnett*, 963 S.W.2d at 657. The remedy for an excessive verdict based on that ground is a new trial. *Id.* There is no issue on this appeal about the denial of a motion for new trial. Additionally, the argument referred to was not objected to, and Catalina makes no claim of misconduct by Plaintiffs' counsel in this regard.

S.W.2d at 176. In computing the loss of consortium for the loss of a parent for a child, factors such as the physical, emotional, and psychological relationship between the parent and child must be considered. *Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 343 (Mo.App. E.D.2000); *Barnett*, 963 S.W.2d at 657. In evaluating whether an award is excessive, the reviewing court should consider the evidence in the case and the verdict in light of the following factors: (1) loss of income, present and future, (2) medical expenses, (3) decedent's age, (4) the nature and extent of the injuries, (5) economic factors, (6) awards given and approved in comparable cases, and (7) the superior opportunity for the jury and trial court to appraise decedent's injuries and other damages. *Coggins*, 37 S.W.3d at 343, citing *Barnett*, 963 S.W.2d at 657.

In this case, it is obvious that Plaintiffs were close to decedent, have felt his loss in many painful ways, and have suffered tremendous damage by his death. Catalina argues, however, that although here there was graphic evidence of decedent's physical condition following the incident that caused his death, there was no evidence that he suffered between the time of the injury and the time of death. It also argues that there was no direct evidence of any economic loss suffered by Plaintiffs. Plaintiffs do not dispute those contentions. The jury was correctly instructed not to consider grief and bereavement, and, significantly, no issue of aggravating circumstances was submitted to the jury. At the conclusion of the trial, Plaintiffs' attorney vigorously argued that the jury should compensate them for their loss by awarding $10 million.

Along with consideration of the evidence, it is also necessary to consider compensatory awards in other death cases. *Letz*, 975 S.W.2d at 176. In *Letz*, the appellate court reviewed wrongful death awards in Missouri from 1986 until the date of that case (1997), finding that most damage awards had ranged from about ten thousand to hundreds of thousands of dollars, with a few cases affirmed on appeal in the one to two million dollar range. *Id.* at 176–77. The court noted one case, *Call v. Heard*, 925 S.W.2d 840 (Mo. banc 1996), involving a $5 million judgment for compensatory damages in a case involving the wrongful death of three family members including the parent who was the principal source of income. The court noted that there was then no reported Missouri cases disclosing a jury verdict compensating a plaintiff for a wrongful death case in a sum approaching $5 million. *Letz*, 975 S.W.2d at 177.

*Letz* involved the death of a twenty-year-old mother of two young boys. The suit for wrongful death filed by her sons and mother resulted in a jury verdict of $70 million. Significantly, the issue of aggravating circumstances was submitted to the jury in *Letz*, and under the procedure at that time, a single verdict covering both compensatory and aggravating circumstances was returned. The appellate court, therefore, undertook to determine, for the purposes of a motion for remittitur, how much of the verdict was for compensatory damages and how much was for aggravating circumstances/punitive damages. After considering other Missouri verdicts for wrongful death, the close relationship between the decedent and the plaintiffs, the conscious physical pain suffered by the decedent after her injury but before her death, and the testimony of an expert that the economic loss suffered by decedent's sons by reason of her death was $798,643, the court concluded that "a compensatory award for the death of [decedent], if separately delineated, would not have exceeded $2.5 million." *Id.* at 177. The court reasoned, therefore, that the remaining $67.5

million of the judgment was for aggravating circumstances. It ordered that if the plaintiffs entered a remittitur of $41 million of the judgment, the judgment would stand affirmed for $29 million, representing $2.5 million in compensatory damages and $26.5 million in punitive damages. *Id.* at 180.

*Barnett,* decided the same day as *Letz,* involved the wrongful death of a forty-year-old husband and father of two. A remittitur was ordered by the trial court on the jury verdict of $175 million for compensatory damages and $175 million for punitive damages, to $25 million for the compensatory damages, and $87.5 million for the punitives. On appeal, the court noted evidence that demonstrated that the lost past and future earnings, benefits and household services related to decedent's death amounted to $649,080, and that decedent had suffered conscious pain before his death. It concluded that the $25 million compensatory damage award ordered by the trial court remained excessive, found that $3.5 million was an appropriate compensatory damage award, and ordered remittitur accordingly. 963 S.W.2d at 658.

Since the *Letz* and *Barnett* cases, there have been other wrongful death verdicts in Missouri. Those that have been the subject of appellate review, although not always on the issue of damages, include: *Havrum v. United States,* 204 F.3d 815 (8th Cir.2000)(a judgment in a court tried case for $450,000 for the death of plaintiff's husband); *Rinehart v. Anderson,* 985 S.W.2d 363 (Mo.App. W.D.1998)(death suit for mother of three resulting in judgment for $350,000); *Linton v. MHTC,* 980 S.W.2d 4 (Mo.App. E.D.1998)(verdicts of $250,000, $500,000 and $1,500,000 for the deaths of three persons).

Another noteworthy case is *Coggins.* In that wrongful death suit, the plaintiffs were the parents of the twenty-year-old decedent, their only child, who lived with them and with whom they had a close relationship. The evidence demonstrated that the decedent died as a result of an explosion caused by a natural gas leak, but survived with burns over nearly his entire body for eighty days, sixty-three of which were spent in a hospital burn unit. Suffice it to say that the *Coggins* opinion recounts evidence demonstrating the profound pain and medical procedures endured by decedent prior to his death. 37 S.W.3d at 343. The jury returned a verdict of $4,380,000 as compensatory damages for the death which was affirmed on appeal. *Id.* at 343–44.

Considering the fact that Plaintiffs are entitled to be fairly and adequately compensated for their tremendous loss, I believe that there was an abuse of discretion by the jury and trial court, and that the judgment entered on the jury verdict was excessive by at least $10 million. In arriving at that opinion, I have considered other wrongful death verdicts in Missouri, the obvious and devastating loss suffered by Plaintiffs, the fact that there was no direct evidence of economic loss, there was no evidence of conscious pain prior to decedent's death, the fact that aggravating circumstances was not an issue in this case, and the fact that no damages are to be awarded in such cases for grief and bereavement. I believe it is also significant that the amount of the jury's verdict exceeded by $5 million the amount Plaintiffs' attorney had argued should be awarded. (In *Coggins,* the appellate court noted, in affirming the denial of remittitur, that the award was less than the amount requested by plaintiffs' counsel. 37 S.W.3d at 343).

It has been said that "no system is perfect and on occasion a jury will reach an incorrect result in the eyes of all reasonable persons. '[A] jury is not free to award any sum it might choose, however,

large or small, whether from anger, sorrow, prejudice, mistake, or other improper cause.'" *Barnett,* 963 S.W.2d at 661–62, citing *Cates v. Eddy,* 669 P.2d 912, 920 (Wyo.1983). In my opinion a substantial remittutur in this case is compelled by the goal of providing fair, reasonable, and equitable compensation for a compensable loss, but not that which is so excessive as to constitute an injustice. In reaching that conclusion, I do not minimize or disregard the tremendous loss suffered by Plaintiffs, but do so with the realization that no amount of compensation could be considered by them as "adequate," and that the goal for fairness in our system applies to both sides of such controversies.